Filed 5/13/15  P. v. Contreras CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY LOPEZ CONTRERAS,<br><br>    Defendant and Appellant. | D064999<br><br><br>(Super. Ct. No. SCD238193) |


APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Anthony Lopez Contreras of attempted murder (Pen. Code,[1] §§ 664/187 subd. (a); count 1); and shooting at an occupied vehicle (§ 246; count 2). The jury found the attempted murder was premeditated. (§ 189.) The jury further found true allegations that Contreras was a principal in the offenses and at least one principal personally discharged a firearm (§ 12022.53, subd. (e)(1)), and Contreras committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by a gang member. (§ 186.22, subds. (b)(1), (b)(4), (b)(5).) The jury was unable to reach a verdict on count 3, which charged Contreras with possession of a firearm by a felon. (§ 12021, subd. (a).)[2] The court declared a mistrial with respect to that count and granted the prosecution's motion to dismiss it. The jury also found not true the allegations that Contreras personally discharged a firearm within the meaning of section 12022.53, subdivision (d).

The trial court sentenced Contreras to prison for life for the attempted murder, plus 25 years to life for the gun enhancement. The court stayed Contreras's sentence for count 2.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] Section 12021, subdivision (a), is now section 29800, subdivision (a), which became effective January 1, 2012. (Stats. 2010, ch. 711, § 6.) The Law Revision Commission Comments to section 29800 make clear that the provision was carried over "without substantive change." (Nonsubstantive Reorganization of Deadly Weapon Statutes (June 2009) 38 Cal. Law Revision Com. Rep. (2009) p. 758.) We will refer to the provision by its former designation. (See *People v. Correa* (2012) 54 Cal.4th 331, 334, fn. 1.)

Contreras appeals, contending the trial court prejudicially erred by (1) providing the jury with a modified version of CALCRIM No. 1403 allowing use of evidence of gang activity to determine whether the defendant aided and abetted a crime; and (2) instructing the jury regarding the natural and probable consequences doctrine in response to a jury question. Contreras also claims cumulative errors lowered the prosecution's burden of proof and warrant reversal. We reject these contentions and affirm.

FACTUAL BACKGROUND

Prosecution

In November 2011, Javier Rodriguez drove his truck to a taco shop in San Diego. He parked his truck and went to the walk-up window to order some food. A small, gold, four-door car pulled up in the drive-through line. The front passenger, who Rodriguez later identified as Contreras, asked Rodriguez where he was from. Rodriguez interpreted the question as asking whether Rodriguez was in a gang. Rodriguez said he was from "nowhere," meaning he did not "claim a hood, a gang or nothing." Contreras responded, "What's up fool? This is Encanto." Rodriguez knew that Encanto was a gang and responded, "That's cool." Contreras showed Rodriguez a gun, which Contreras had on his lap.

After receiving his food, Rodriguez walked back to his truck. He then drove out the back driveway of the taco shop. Rodriguez had to circle back in front of the taco shop to leave the area. As he drove by, he noticed that the gold car was no longer in the drive-through line. As Rodriguez was driving away, he realized that the same gold car

3

was behind him. Rodriguez eventually stopped his car to find out why the car was following him.

The gold car pulled in front of Rodriguez's truck. The passenger got out of the car, pulled out a chrome-colored gun, and started shooting at Rodriguez from about five or six feet away.[3] Rodriguez put his left arm up over his head to try to block the shots. He got hit three times—twice in his arm and once in his back. He also had a graze wound on his side.

The man got back in the gold car and left the scene. Rodriguez then drove to his girlfriend's house so she could drive him to the hospital. He did not drive directly to the hospital himself because he had been drinking[4] and was worried he would get a "DUI."

Later that same day, the police located Rodriguez's truck at his girlfriend's mother's house. Inside the truck they found blood, broken glass, and two expended bullets.

Three days after the shooting, San Diego Police Detective Llanina Medina interviewed Rodriguez at the police station. He told her that the individuals involved in the shooting had announced they were from Encanto. He also described the shooter as a light-skinned Hispanic male, who was about five feet 10 inches tall, chubby, and 18 to 21

---

[3]   The prosecution argued that Contreras was the shooter. Contreras's trial counsel argued Contreras was only the driver of the car on the night in question, but did not admit that he was involved in any shooting.

[4]   The parties stipulated Rodriguez's blood alcohol content was tested at Mercy Hospital and determined to be 0.15 percent. Rodriguez had also done two "lines" of methamphetamine earlier that day, hours before the shooting.

4

years old. Medina contacted San Diego Police Detective Damon Sherman, who was responsible for covering the Encanto gang (also known as Varrio Encanto Locos or VEL), and gave him the description.

According to Sherman, there were only about 35 documented members of the Encanto gang in 2011. Only Contreras met the description Rodriguez had given. He was 20 or 21 years old, light-skinned, five feet 10 inches or five feet 11 inches, and chubby. Moreover, he drove a four-door gold Toyota Corolla. Sherman drove to Contreras's residence, saw the Corolla parked out front, and took a photograph of it.

Almost a month after the subject incident, Sherman showed Rodriguez a photograph of Contreras's car. Rodriguez did not know if it was the exact car, but it was the same color, style, and had the same number of doors as the car involved in the shooting. Sherman also showed Rodriguez a photographic lineup, and Rodriguez identified Contreras as the shooter.

Rodriguez gave some prior inconsistent statements about exactly how and where the shooting took place.[5] He explained that he did so because he did not want to go to court and because some of the officers who spoke with him initially suggested that he was involved in an unrelated shooting that took place in Sherman Heights on the same night.[6]

---

[5]    We do not discuss these different version of events here because they are not relevant to the resolution of the issues presented.

[6]    A witness to the Sherman Heights shooting testified that two people inside a silver F-150 Ford truck with an extended cab exchanged words with people in a brown house.

The jury was shown surveillance videos from the taco shop, which showed Rodriguez's truck pulling into the parking area at 8:55 p.m. At 9:01 p.m., the video showed Rodriguez walking back to his truck and driving away. At 9:02 p.m., the video showed a gold car pulling out of line. It also showed Rodriguez driving by.

The police subsequently arrested Contreras. Sherman interviewed Contreras at the police station. A video recording of that interview was shown to the jury. Contreras told Sherman that he had gone to the taco shop on the night in question around 8:00 p.m. with his friend, Rafa (Raphael Contreras). He claimed his girlfriend had gotten out of the hospital the day before, and she wanted a burrito. While Contreras and Rafa were in line waiting to order, Contreras called his girlfriend who said that she did not like the burritos from that taco shop. Contreras pulled out of line before ordering and drove to a different taco shop.

Sherman told Contreras that the cameras at the taco shop showed him getting into a disagreement with someone. Contreras stated that it was not a disagreement. He claimed he knew Rodriguez and just shook his hand. Contreras said he could not remember Rodriguez's name, but thought that he went by Silly or Smokey.[7] Contreras claimed he dropped off Rafa at home, got his girlfriend's burrito from a different taco shop, and went home.

_____

Some people from the brown house started shooting at the truck as it drove down the street. According to the witness, Rodriguez's truck was not the one being shot at that night in Sherman Heights and Rodriguez was not the person driving the truck.

[7]     Rodriguez testified that he had never used any nicknames like Silly or Smokey.

6

During the police interview, Contreras talked about having made two phone calls to his girlfriend that night about the burrito she wanted. He claimed he called her once while he was at the drive through, and a second time as he was driving by her house. Sherman seized Contreras's cell phone and obtained his phone records. The phone records showed that he did not make or receive any phone calls between 7:53 p.m. and 9:54 p.m. on the subject night. Moreover, Rafa testified that although Contreras came over to his house on the night at issue, Rafa did not go to the taco shop with him that night.

Abril Huerta, the mother of Contreras's two children, testified that she had a baby the day before the incident and was released from the hospital the next day. Contreras drove her home between 6:00 and 7:30 p.m. in his mother's gold Corolla. He then went home to get some clothes. He was gone three or four hours, and he did not return until around 11:00 or 11:30 p.m.

The jury heard recordings of telephone calls involving Contreras while he was in jail. In the first phone call, Contreras told his brother to take his speakers and everything else out of the Corolla, including his tools and "my thing." Contreras's brother said he was looking for it, but could not find it. Contreras said it was where he put his tools in the back "on my side."

In the next phone call, Contreras called his girlfriend. She asked, "Where's the book you had told your brother about?" He responded, "What book, baby?" She said, "The one you had told your brother about yesterday." Contreras said it was in the Corolla. She asked, "I know but where?" Contreras then told her to put his brother on

7

the phone. The brother said he could not find it. Contreras told him to "remove the thing, there where, where I used to put it fool." The brother said he looked there, but could not find it. The brother then said that he found it. Contreras told him to be careful because "the remote" had "batteries on top."

Contreras's brother later was pulled over by police. He was found in possession of a .40 caliber Beretta and .40 caliber bullets.

In a third jail phone call, Contreras's brother told him that he had gotten "into some bullshit" and had just gotten "out" yesterday. The brother explained that he had gotten "caught up with that shit." When Contreras asked which one, his brother responded, "Fool come on now, you don't even got to ask that. You already knew." Contreras asked if it was the "R" or the .40. Oscar said it was the .40. Then Contreras said with respect to the "remote," that his brother should be careful because he had "batteries right there too." Sherman opined that Contreras and his brother were talking about a .40 caliber weapon.

Sherman testified as a gang expert. He explained that the Encanto gang is a Hispanic street gang that occupies the Encanto neighborhood of San Diego. Contreras was a member of the Encanto gang, and his moniker was Bandit. In November 2011, at the time of the subject shooting, there were between 35 and 38 documented members. The gang's turf included the neighborhood where the taco shop was located. The gang's primary activities were murder, attempted murder, assault with a firearm, carjacking, and robbery.

8

Sherman explained that issues involving respect are the cause of many violent confrontations by and between gang members. Violence is often the result of perceived disrespect. Disrespect can result from someone claiming a neighborhood to an individual and having them walk away without the acknowledgment of the power that the first person was trying to project with that proclamation. Sherman explained that by stating "What's up, fool. This is Encanto," Contreras was initiating a gang challenge to Rodriguez. If a person does not acknowledge a gang member who issues a gang challenge like the one Contreras issued, that is perceived as a sign of disrespect.

If a gang member shoots at someone whom he feels has disrespected him, his status in the gang is elevated because he is perceived as having "put in work" in the name of his gang. If the shooting occurs in the gang's territory, that benefits the gang by creating fear and reaffirming the gang's presence there. Based upon a hypothetical mirroring the facts in this case, Sherman opined that the shooting was committed for the benefit of the gang member and his gang.

## Defense

Contreras's primary defense at trial was that Rodriguez was not credible and it was a case of mistaken identity. Also, evidence was presented that Contreras was only the driver of the car on the night in question.

## DISCUSSION

Contreras raises three issues on appeal. First, he contends the trial court erred in providing the jury with a modified version of CALCRIM No. 1403, which allowed use of evidence of gang activity to determine whether Contreras aided and abetted a crime.

Second, Contreras maintains the trial court also erred by instructing the jury regarding the natural and probable consequences doctrine in response to a jury question. Finally, Contreras argues cumulative error warrants reversal. We reject these contentions.

I

*CALCRIM NO. 1403*

Contreras maintains the trial court improperly instructed the jury with a modified version of CALCRIM No. 1403, which provided that the jurors could consider evidence of gang activity in determining whether he aided and abetted the charged offenses. He argues the instruction lowered the prosecutor's burden of proof in violation of Contreras's Sixth Amendment due process rights, and violated Evidence Code section 1101, subdivision (a)'s prohibition against the use of character evidence. We disagree.

A. Background

At trial, the prosecutor proceeded on the theory that Contreras was the passenger in the gold car, and he was the person who shot Rodriguez. During the discussion of jury instructions, the trial court noted that it believed an aiding and abetting instruction was appropriate. Contreras's trial counsel agreed to the instruction, stating, "[o]bviously if [the prosecution] believed there was another individual in the car and my client was involved, aiding and abetting would be involved."

The trial court instructed the jury with CALCRIM No. 401 (Aiding and Abetting: Intended Crimes) as follows:

> "To prove that the defendant is guilty of a crime based on aiding and
> abetting that crime, the People must prove that:

10

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

The trial court also instructed the jury, over defense objection, with a modified version of CALCRIM No. 1403 (Limited Purpose of Evidence of Gang Activity), which allowed the jury to consider evidence of gang activity "to determine whether a person aided and abetted a crime." Specifically, the court instructed the jury as follows:

"Now, we are talking about the gang allegation, ladies and gentlemen, and you heard testimony which I allowed as expert witness testimony from Detective Sherman about gangs and criminal street gangs. The instruction I am giving you now is number 1403 that tells you how you can use that testimony and, even more importantly, it tells you how you cannot use that testimony. May I read that to you now.

11

"You may consider evidence of gang activity or involvement only for the following limited purposes, in other words, only to decide the following:

"Whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements charged;
[¶] . . . [¶]

"You may use it, if you find it relevant to do so, to determine whether a person aided and abetted a crime.

[¶] . . . [¶]

"May I emphasize for you. You may not consider this evidence for any other purpose. Specifically you may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit that crime.

"In other words, you have heard evidence of this gang called the Varrio Encanto Locos, you have heard evidence of bad things they have done, you have heard evidence that he is a member of that. You might be tempted to make the logical leap, well, if a person is a member of a group that does that, then he is of bad character, bad actor and he is going to be the kind of guy who would commit the crimes charged here. And you may not use it for that purpose. You may only use it for the purposes I just described here. We can't just say, you know what, I have heard enough based on the fact that he is a gang member of a gang that does that kind of thing.

"You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition or a predisposition to commit crime."

## B. Analysis

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed

12

in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given.  (*Ibid*.)  " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]"  (*Ibid*.)

Contreras protests that in his case CALCRIM No. 1403 allowed the prosecution to improperly prove he aided and abetted another individual to shoot Rodriguez.  He claims gang activity cannot be used for this purpose.  He cites no authority for his position, and it is Contreras's burden to provide legal authority in support of his contentions.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. omitted ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)

Instead of legal authority supporting his specific contention,[8] Contreras relies on the general rule that evidence of a defendant's criminal disposition is inadmissible to prove he or she committed a specific crime.  (Evid. Code, § 1101, subd. (a).)  Contreras has correctly stated the general rule regarding character evidence, but he has not shown the modified version of CALCRIM No. 1403 given here permitted the jury to use gang evidence in a way the instruction pointedly says it should not be used.

---

[8]     Contreras cites to a Ninth Circuit case to support his position that the modified CALCRIM No. 1403 instruction was given in error.  We observe that Ninth Circuit cases are not binding authority on this court.  (See *People v. Seaton* (2001) 26 Cal.4th 598, 653.)  In addition, none of the Ninth Circuit cases, which Contreras relies on hold that evidence of gang activity cannot be used to prove aiding and abetting.

13

Contreras fails to appreciate that "[a] crime is gang related if it is related to a criminal street gang as defined in section 186.22, subdivisions (e) and (f). The elements of this definition require: (1) an ongoing organization or group, (2) of three or more persons, (3) having as one of its primary activities the commission of the crimes enumerated in section 186.22, subdivision (e)(1)-(25), (4) having a common name or symbol, and (5) whose members individually or collectively have engaged in a pattern of criminal gang activity." (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 944.) Once the jury determines a crime is gang related, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez*).)

Here, the information charged a gang-related attempted murder and gang-related shooting at an occupied vehicle. Indeed, the interaction between the victim and the shooter at the taco shop can only be explained through the gang context. In such a case, evidence of gang membership and activity was clearly relevant to prove Contreras had the specific intent to benefit the Encanto gang by participating in the attempted murder. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1516, 1518-1519.)

Moreover, we see no reason why the gang evidence could not be properly considered to prove aiding and abetting. Evidence was presented that Contreras told the police that he was not the passenger in the gold car, but the driver. Thus, under this

14

version of events, he was not the shooter. If the jury believed his version of events, then the prosecutor could still prove that Contreras aided and abetted the actual shooter, who was a passenger in the car. The trial court gave instructions on aiding and abetting, which specifically required the jury to determine Contreras's knowledge of the intended crime and when he obtained that knowledge and formed the intent to assist the perpetrator. The gang evidence would be relevant to prove these facts.

Here, Sherman testified about Encanto's primary activities, which included murder, attempted murder, assault with a firearm, carjacking, and robbery. He additionally testified about Encanto's territory and how a shooting in its territory would benefit that gang. Sherman also testified, based on a hypothetical mirroring the facts of the case, that the shooting was done for the benefit of the Encanto gang. This evidence clearly was relevant to Contreras's motive, intent, and "other issues pertinent to guilt of the charged crime" that would include his knowledge of what the passenger intended and was prepared to do (i.e., shoot at Rodriguez after a verbal disagreement at the taco shop) if the jury believed Contreras was only the driver and did not shoot the gun. (*Hernandez*, *supra*, 33 Cal.4th at pp. 1049-1050; see *People v. Samaniego* (2009) 172 Cal.App.4th at pp. 1167-1168 (*Samaniego*).)

Further, under the circumstances of this case, CALCRIM No. 1403 had to be given at the prosecutor's request. (See, e.g., *Hernandez*, *supra,* 33 Cal.4th at pp. 1051-1052 [the law is clear that a court may not give No. 1403 sua sponte but, if requested—as it was here, by the prosecution—it must be given]; *People v. Jones* (2003) 30 Cal.4th 1084, 1116.) And, CALCRIM No. 1403 states in no uncertain terms gang evidence is

15

inadmissible to prove character, or that the defendant is a bad person or has a criminal propensity. It allows such evidence to be considered only on the issues germane to the gang-related crimes and enhancements. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1168; cf. *People v. Garcia* (2008) 168 Cal.App.4th 261, 275; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413.)

In sum, Contreras's arguments overlook the essential purpose of CALCRIM No. 1403, which is to clarify the limited purpose of gang evidence. CALCRIM No. 1403 is used to minimize undue prejudice to a defendant whose case involves otherwise highly prejudicial gang evidence. The instruction clearly states gang evidence is admitted for limited purposes only. It also delineates those purposes. And, the final paragraph emphasizes: "You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition or a predisposition to commit crime." Contreras has failed to provide any evidence from the record that supports his speculation the jury found the instruction confusing, or improperly relied on gang evidence as proof he is a person of bad character with criminal propensities. The trial court did not err.

II

*NATURAL AND PROBABLE CONSEQUENCES DOCTRINE*

Contreras next contends the court erred in instructing the jury on the natural and probable consequence doctrine. Specifically, he argues that he did not have adequate notice that he could be convicted under this doctrine and his due process rights to a fair trial thus were violated. We disagree.

16

## A. Background

During deliberations, the jury submitted the following question to the court: "We need clarification/explanation regarding instruction 401 (page 32) of jurors' instructions, specifically regarding: #2. The defendant knew that the perpetrator intended to commit the crime."

The court gave the following response:

"It is not clear from the jury's note what type of clarification or explanation is being sought with respect to Instruction 401, paragraph 2. That paragraph sets forth one of the elements the People must prove in order for the jury to find that the defendant is guilty of a crime based on aiding and abetting a crime. Specifically, it provides, 'The defendant knew that the perpetrator intended to commit the crime.' Instruction 400 defines 'perpetrator' for purposes of this case. Words and phrases not defined in these instruction[s] should be applied using their ordinary, everyday meanings. [¶] These instructions (400 and 401) only apply to an aider and abettor, and not the actual shooter. [¶] If possible, please clarify in writing the jury's question."

The jury responded:

"Judge [¶] Per 401, Paragraph 2, does the wording 'commit THE crime' mean specifically attempted murder in this case, or ANY crime that results from the actual actions of the individual or individuals involved. [¶] For example: [¶] If a person asks his friend for a ride to 7-11 with the intent to rob it. The person goes in and shoots the clerk, is the friend guilty of aiding and abetting a shooting or just aiding and abetting the robbery."

The prosecutor asked Judge Michael Smyth, who was sitting in for the trial judge, to respond to the jury's question by instructing them on the natural and probable

17

consequences theory of aider and abettor liability. The prosecutor also requested that the court instruct on sections 245 (assault with a firearm) and 246 (shooting at an occupied vehicle) as predicate crimes.

The prosecutor explained to Judge Smyth that he had proceeded on a theory that Rodriguez was the actual shooter, not an aider or abettor. Nevertheless, aider and abettor instructions were given based upon: (1) Contreras's statement to police that he was driving the gold car on the night of the shooting: and (2) Rodriguez's testimony that the passenger of that car was the person who shot him.

Rodriguez's trial counsel argued that natural and probable consequence instructions should not be given because, if that theory had been presented at trial, "different strategies might have been used." Judge Smyth stated that he felt obligated to give a modified version of CALCRIM No. 403, which allowed the jury to consider a natural and probable consequence theory.

The judge thus instructed the jury as follows:

> "A defendant may be found guilty of committing attempted murder as charged in count 1 as either a direct perpetrator or as an aider and abettor to the crime. A person may also be guilty of a crime committed by another which was a natural and probable consequence of a crime the defendant aided and abetted. The requirements for such liability are the subject of this instruction.

> "In order to find the defendant guilty of attempted murder under a theory that the crime of attempted murder charged in count 1 was a natural and probable consequence of the crime of shooting at an occupied motor vehicle or the crime of assault with a firearm, you must first decide whether the defendant is guilty of shooting at an occupied motor vehicle or assault with a firearm.

18

"Under this theory of liability, to prove that the defendant is guilty of attempted murder, the People must prove:  1, The defendant is guilty of shooting at an occupied motor vehicle or assault with a firearm as an aider and abettor; 2, During the commission of shooting at an occupied motor vehicle or assault with a firearm, a co-participant in that crime committed the crime of attempted murder; and 3, Under all of the circumstances, a reasonable person in the defendant's position would have known the commission of the attempted murder was a natural and probable consequence of the commission of shooting at an occupied motor vehicle or assault with a firearm.

"A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural or probable, consider all the circumstances established by the evidence.

"If the attempted murder was committed for a reason independent of the common plan to commit the shooting of an — at an occupied motor vehicle or the assault with a firearm, then the commission of attempted murder was not a natural and probable consequence of shooting at an occupied motor vehicle or assault with a firearm.

"To decide whether the crime of shooting at an occupied motor vehicle or assault with a firearm was committed, please refer to the separate instructions that I will give you on those crimes.

"If you decide that the defendant aided and abetted the crime of shooting at an occupied motor vehicle or the crime of assault with a firearm, and that the attempted murder was a natural and probable consequence of that crime, the defendant is guilty of attempted murder.  You do not need to agree about which of these crimes the defendant aided and abetted."

The judge then read the jury an instruction setting forth the elements of assault with a firearm.  The jury had already received an instruction setting forth the elements of shooting at an occupied motor vehicle.

19

After the instructions were read, the parties were given an opportunity to present further argument. The prosecutor discussed the natural and probable consequence doctrine, but reminded the jury that his theory of the case was that Contreras was the actual shooter.

Rodriguez's counsel argued to the jury that this was not a natural and probable consequences case. He explained that, to get to that theory, the jury had to disbelieve Rodriguez's testimony that Contreras shot him. Counsel urged the jury to find that Rodriguez's testimony was not credible and to find Contreras not guilty.

After the jury reached its verdict convicting Contreras of attempted murder, Contreras moved for a new trial. In that motion, he argued that Judge Smyth had abused his discretion when he instructed the jury on the natural and probable consequence theory in response to the jury's questions.

The prosecutor countered that two jurors appeared to have had a question about whether Contreras was the shooter or the driver.[9] Because the parties had already agreed to instruct the jury on aiding and abetting due to Contreras's claim that he was the driver, Contreras was on notice that the evidence could support a natural and probable consequence theory.

The trial court found that Judge Smyth properly gave the instruction on the natural and probable consequences theory because there was a factual basis for it. "And as we now know from the jurors' note, this was something that concerned them, and it was

---

[9]     Apparently, the prosecutor based this argument on the fact the jury was "ten to two for guilty" on count 3 (possession of a firearm by a felon).

20

raised by the evidence."  With respect to whether the defense had notice of a natural and

probable consequences theory under the due process clause, the trial court stated:

> "I think a couple of things are noteworthy here.  First of all, the jurors were instructed on the aiding and abetting the first time around. 400 and 401 were given.  That's classic aiding and abetting. The natural and probable consequence instruction was not given the first time around.  But it is not as though aiding and abetting was unknown to this case.
>
> "Also, the fact that the People presented a firearm allegation, the gang-related firearm allegation, section 12022.53 under the (d) and (e) theories, the vicarious personal use, I think shows that aiding and abetting was on the table to begin with.  Natural and probable consequences is just a variation of the aiding and abetting rule.
>
> "Next, I think it is significant that we find ourselves addressing these things right now because of a question asked by the jurors.  Frankly, I think it was a pretty perceptive question, given whatever their factual findings must have been at that point.
>
>            ***
>
> "Then we come to the decision point of what is the court's duty to respond to questions from the jurors about the law.  And then the other part raised by [defense counsel] is, well, even if the court has a duty to respond, is there a point at which the line is crossed such that the defense is ambushed and cannot effectively defend.
>
> "Well, Penal Code section 1138 I think is sometimes misread by trial judges.  That's, in my personal view, I think trial judges all too often punt by just saying to the jurors, you have got the instructions. Reread them.  And don't answer the questions.
>
> "Here the jurors asked for a specific.  They asked a specific question. I think that their question triggered the natural and probable consequences instruction.  And I think, frankly, the court would have a duty to give that instruction to respond to the jurors' question.
>
> "Now, that's only half the equation, because the other half is defense counsel—is the defense unfairly surprised by this.  I confess it is, at first blush, a bit thin when we say to defense counsel at the end of a

21

well-tried case with a number of variables in it, well, gosh, now that the jury has asked this question, we are going to add another theory under which the jurors might find him guilty. I understand that that is something that seems not palatable.

"But the question is whether it is a due process, a Sixth Amendment, sorry, violation, a notice and right to be heard violation. And I don't think it is. It was triggered by a question from the jurors. Aiding and abetting was not unknown in this case. And I think that the court has a duty to respond to that question. And I think CALRIM 403 did that.

"I don't know that it is for this court to assess the question of prejudice. But I am going to. I have racked my brain, and I can't really think of what might have been done differently had the people up front said, we are going to shotgun it and seek every possible theory of liability even though we are urging personal shooter liability. It is hard to imagine what evidence could have been presented differently or what questions could have been asked on cross-examination had that expressly been stated. And I find that there is no prejudice particularly because the judge, Judge Smyth, allowed further argument by both counsel at that point. In any event, a reviewing court will do what it will. But I don't find that to be well taken."

## B. Analysis

Citing *People v. Prettyman* (1996) 14 Cal.4th 248 (*Prettyman*), Contreras asserts

that the trial court could not give the modified CALCRIM No. 403 instruction as a matter

of law because the prosecution did not proceed on that theory. We disagree.

*Prettyman*, *supra*, 14 Cal.4th 248 does not stand for the proposition that a court

cannot give a jury instruction regarding the natural and probable consequences doctrine

unless the prosecutor relied on that theory. Instead, there, our Supreme Court concluded

the trial court erred in failing to give jury instructions "identifying and describing each

potential target offense supported by the evidence" once it provided the natural and

22

probable consequences instruction. (*Id.* at p. 270.) The court did note, however, the trial court was under no duty to sua sponte instruct the jury on the natural and probable consequences doctrine when the prosecutor did not proceed on such a theory. (*Ibid.*)

Here, the court did not sua sponte instruct the jury, but instead, provided a modified version of CALCRIM No. 403 in response to the jury's questions. *Prettyman, supra,* 14 Cal.4th 248 therefore is not instructive here. Moreover, contrary to Contreras's assertion, a court is not prohibited from instructing a jury on a theory merely because the prosecution did not pursue that theory. (See *People v. Ardoin* (2011) 196 Cal.App.4th 102, 128 (*Ardoin*) [" '[A] court is not *precluded* from giving any instruction for which there is evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.' "].)

The trial court did not provide the challenged instruction sua sponte. Instead, it presented it to the jury in response to a written question from the jury. Under section 1138, the trial court must " 'attempt "to clear up any instructional confusion expressed by the jury." [Citations.]' [Citation.]" (*Ardoin*, *supra*, 196 Cal.App.4th at p. 128.) "When a jury asks a question after retiring for deliberation, '[s]ection 1138 imposes upon the [trial] court a duty to provide the jury with information the jury desires on points of law.' [Citation.] But '[t]his does not mean the [trial] court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citation.] We review for an

23

abuse of discretion any error under section 1138." (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.)

Contreras maintains the court responded improperly to the jury's question regarding what was meant by "the crime." He contends there was no need to instruct on the natural and probable consequences doctrine. Instead, Contreras insists the court only needed to tell the jury that the word "crime" in element 2 of CALCRIM No. 401 referred to the separately charged crimes. We are not persuaded. Merely referring to the separately charged crimes would not have adequately answered the jury's question. Instead, to answer the question correctly, the trial court found it necessary to instruct the jury on the natural and probable consequences doctrine.

The natural and probable consequences doctrine "is based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' " (*Prettyman*, *supra*, 14 Cal.4th at p. 260.) In asking the court to further define the phrase "the crime," we believe it would have been error for the trial court merely to point the jury back to the charged crimes. The trial court correctly instructed the jury on the natural and probable consequence doctrine so the jury understood that it could not convict Contreras of attempted murder as an aider and abetter simply by finding he aided and abetted the crime of shooting at an occupied motor vehicle. Instead, the juror, if he or she believed Contreras did aid and abet that crime, also would have to be convinced that attempted murder was the natural and probable consequence of that crime. The court did not abuse its discretion.

24

In addition, we are not convinced that Contreras's Sixth Amendment rights were violated because he did not have notice that he could be convicted under the natural and probable consequences doctrine. The jury was instructed with a general aiding and abetting instruction. Contreras thus was on notice that the jury could consider this theory. Although the prosecutor did not proceed on that theory, it became relevant because of evidence of Contreras's statement to the police that he was the driver of the car on the subject night. The natural and probable consequence doctrine instruction merely expanded on the previous aiding and abetting instruction. (Cf. *People v. Lucas* (1997) 55 Cal.App.4th 721, 737.) The instruction was provided in response to a jury question. And the parties were permitted to argue to the jury why the natural and probable consequences doctrine should or should not apply. (See *Ardoin*, *supra*, 196 Cal.App.4th at p. 129 [After instructing the jury that the felony-murder instructions would also apply to Ardoin, "fairness dictated that the court also reopen the case for the limited purpose of granting Ardoin's counsel the right to offer rebuttal argument."].) Under these facts, we are satisfied that Contreras had sufficient notice and the Sixth Amendment was not violated.

Moreover, Contreras does not articulate how he was prejudiced by the natural and probable consequences instruction. He does not explain what his counsel would have done differently at trial. He does not contend that substantial evidence does not support the verdict. Contreras simply implies that he was not able to prepare an adequate defense. However, we are left guessing what this adequate defense would be. Contreras's trial counsel's strategy appeared to be to challenge Rodriguez's credibility and

25

argue this was a case of mistaken identity. These arguments applied equally whether Contreras directly committed the offense or aided and abetted any of the charged or target offenses. As such, we conclude there was no prejudice even if it was error to provide the modified CALCRIM No. 403 instruction.

## III

### *CUMULATIVE ERROR*

Contreras maintains the cumulative effect of the asserted errors rendered the trial so unfair as to violate his federal and state constitutional rights to due process warranting reversal of the judgment. We have rejected Contreras's claims of error. Because we hold no errors exist, this cumulative error argument necessarily fails. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative effect of errors when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)

### DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.

26