[No. G026941. Fourth Dist., Div. Three. Nov. 17, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE FELIX MARTINEZ, Defendant and Appellant.

COUNSEL

Diane E. Berley, under appointment by the Court of Appeal; and Amanda F. Doerrer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RYLAARSDAM, J.**—After his first trial ended in a hung jury, defendant Eddie Felix Martinez was retried and convicted of the following: one count of first degree murder (count 1), two counts of attempted murder (counts 2 and 3), two counts of shooting at a motor vehicle (counts 4 and 5), and three counts of assault with a semiautomatic handgun (counts 6 through 8). The jury found true the allegations that the attempted murders were committed with deliberation and premeditation and that defendant personally used a firearm to commit the murder, attempted murders, and assaults. The trial court sentenced defendant to consecutive indeterminate terms of 25 years to life on count 1, two terms of life with the possibility of parole on counts 2 and 3, plus a determinate term of 25 years and four months on counts 4, 5, and 8. The court stayed sentence on counts 6 and 7.

Defendant contends his constitutional rights were violated because, after the preliminary hearing testimony of a nontestifying accomplice, Frank Fierro, was admitted into evidence, the court also permitted the jury to hear a recording of Fierro's statement to the police. Defendant further argues insufficient evidence existed to show the murder and attempted murders were premeditated and deliberated and that the trial court erred by allowing a gang expert to testify "about 'rats' and the concept of 'payback' " in relation to gang culture. The Attorney General contends Fierro's statement was properly admitted under Evidence Code section 1294 and, if not, any error was harmless. The Attorney General further asserts there is substantial evidence to support defendant's convictions for murder and attempted murder and that the gang expert's testimony was properly admitted.

We agree with the Attorney General's latter assertions, and while we conclude the trial court erred in admitting Fierro's statement, we find the error was harmless and affirm the judgment.

## FACTS

One afternoon, Fierro agreed to give defendant a ride home from work. Along the way they stopped at a gas station to purchase some beer. Defendant accompanied Fierro into the mini-market. The cashier noticed that defendant "kept pacing back and forth [and] kept looking outside the window" while Fierro paid for the beer. As the men walked back to Fierro's Honda, two carloads of young Hispanic males pulled into the gas station.

Henry Lopez, the driver of a white vehicle, pulled up to the gas pump opposite Fierro's Honda. Lopez heard someone say, "Where are you guys from?" He looked over to the passenger side window and saw a chrome gun "pointed straight at [them]." Lopez slapped at the gun, and grabbed his front passenger, Martin Gomez, and pulled him out of the car. The shooting started as they ran from the vehicle; a bullet nicked Lopez's left knee.

Francisco Blancas and his 14-year-old brother Augustin were seated in the back seat of Lopez's car. Blancas heard someone ask if they were from "Jeffrey" and saw the person outside the passenger window point a gun at Gomez's head and pull the trigger; the gun did not fire. As the gunman again pulled back the slide on the weapon, Blancas and the others ran from the car. Blancas heard two shots fired, and when he looked back he saw his brother lying on the ground next to the car; Augustin died from a gunshot wound to the head. Blancas later testified he saw the gunman get into the Honda before it drove away.

Gomez, an admitted member of the Jeffrey Street gang, saw two males standing next to the gas pump when Lopez's car pulled into the station. One of the males walked up to Lopez's car and said, "I know you vattos [sic]." The person also said, "You guys are from Jeffrey." He pointed the gun within six inches of Gomez's face and pulled the trigger, but it did not fire. Gomez heard shots being fired as he ran from the car.

Lopez's friend, Raul Ramirez, drove a gray car into the gas station. Ramirez saw a man standing beside a gas pump and another man coming out of the mini-market with a bag. He noticed that the person standing next to the gas pump was "mad dogging" his friends. The person pointed a gun at Gomez, and Ramirez heard shots being fired as he ducked down.

Eyewitnesses gave conflicting descriptions of the shooter's physical characteristics which, coupled with other evidence, either raised the inference or implied that either defendant or Fierro, or both, were culpable. Lopez described the gunman as Hispanic, with short hair, and possibly having a black mole on the left side of his face above his lip. The gunman wore "a

gray shirt with a collar" and a logo; he was approximately five feet 11 inches tall, and weighed between 180 to 200 pounds. Lopez selected defendant's photograph from a book of police photos, and he also identified defendant in court as the shooter even though Lopez did not see a mole or birthmark on defendant's face. The absence of a mole caused Lopez to have a slight doubt as to defendant's identity as the shooter, but Lopez also testified that he was "sure because of the eyes."

The other witnesses gave somewhat different descriptions of the gunman. Gomez described him as five feet nine inches to six feet tall, weighing approximately 160 pounds, light-skinned, with short hair, and wearing a gray "Ben Davis" shirt. The gunman also had a scar on his face. Gomez was "certain" defendant was not the gunman.

Blancas described the gunman as five feet six inches tall, weighing 140 pounds, and wearing gray pants and a muscle shirt. Blancas had identified defendant from a photograph and also identified him in court. Ramirez testified the shooter wore dark clothing, was approximately six feet tall, weighed 160 pounds, and had a three-inch scar on his face. He previously had selected defendant's photograph, but indicated to the police that he was not certain that person was the shooter. Later at trial, Ramirez testified that defendant was not the shooter. Francisco Diaz, who was in the gray car along with Ramirez, described the gunman as wearing a short sleeve shirt with a logo, like a uniform shirt, five feet seven or eight inches tall, and with short, dark hair. Diaz could not identify defendant at trial.

A female customer present during the shooting noticed "a group of boys standing around a white vehicle, and a man pointing what looked to me like . . . a gun inside of the white vehicle." She described the gunman as a Hispanic male with very short hair, five feet seven to eight inches tall, clean shaven, and wearing a white t-shirt.

At the time of his arrest, defendant was five feet seven inches tall and weighed 170 pounds. He did not have a noticeable scar on his face. Fierro, however, was slightly taller and had a visible scar in the area of his sideburns that was over an inch long. Defendant had been wearing gray pants and a gray shirt with his employer's logo on it. Fierro had been wearing a white tank top and jeans.

Two different calibers of shell casings were recovered from different areas at the crime scene, indicating that more than one gun may have been fired during the incident. A forensic scientist testifying for the prosecution determined that all five of the .25-caliber casings had been fired from the same gun, while the .380-caliber casing had been fired from a different gun. A

gunshot residue test on Fierro's hands revealed one particle of residue on his left hand and two particles on his right. Defendant, who was arrested the day after the shooting, had no gunshot residue on his hands. However, the optimum time for administering the test is within five to six hours after a shooting since the ability to detect gunshot residue diminishes with time.

Cosme Viramontes, an admitted member of the Compton Vario 132nd Street gang, was questioned as a possible witness. Initially he told police he knew nothing about the shooting. He later testified that he lied because he had been afraid of "[g]etting killed." But after his arrest for an unrelated crime in 1999, Viramontes contacted a deputy at the jail and said he had information about the shooting. Viramontes testified he was riding a bicycle past the gas station when the shooting took place and recognized defendant as the shooter. He admitted he offered to testify because he wanted "[a] deal" and hoped to get out of jail. A few weeks before trial, Viramontes was released from jail on his own recognizance.

The police searched defendant's home and recovered a shoe box containing a 9 mm gun and various items marked with gang writings, i.e., "CV" and "132nd S/t," meaning Compton Vario, and 132nd Street. A box recovered from the garage held ammunition, including some .25-caliber bullets. An empty gun case was discovered in an attic space.

Defendant denied firing a weapon or shooting anyone at the gas station. He testified that he was putting the beer in the trunk of Fierro's car and took off running when the shooting started. At trial, he claimed that a third companion, Juan Garcia, was the person who had been standing next to the gas pump when the victims drove up, implicating Garcia as the shooter. But defendant had not mentioned a third person when he was initially interviewed by the police. Defendant also testified that he was warned by Garcia the day after the shooting not to say anything to the police. Kevin Carlson, a friend of defendant's who was with Garcia at the time, confirmed that Garcia told defendant "he better not say anything." Garcia's brother testified that Garcia, who died nearly two years after the incident, had admitted being involved in the shooting.

## DISCUSSION

### Admissibility of Fierro's Statement

#### 1. The Trial Court's Ruling

Defendant contends his Sixth Amendment right to confront the witnesses against him was violated by the admission of Fierro's statement to the police.

We conclude the court erred in admitting the statement, but find the error to be harmless beyond a reasonable doubt.

On the evening of the shooting, Fierro went to the police station and voluntarily gave a statement to the police implicating defendant as the shooter. Fierro was not charged with the crimes, but at trial he asserted his privilege against self-incrimination and made himself unavailable to testify. As a result, his preliminary hearing testimony was read into the record; the trial court also permitted the jury to hear the recording of Fierro's statement to the police.

At the preliminary hearing, Fierro had testified that defendant asked for a ride home and they had stopped at the gas station for gas and some beer. As Fierro walked out of the mini-market, leaving defendant inside, he saw two cars pull into the station. When the shooting started, Fierro said, he jumped into his car and took off. He denied telling the police defendant shot at the individuals in the two cars.

In his statement to the police, Fierro said he worked with defendant and that defendant had done the shooting. Fierro had been pumping gas when the two carloads of young males drove into the gas station. "[T]hey started yelling or screaming . . . . And the guy that was with me he . . . started shooting at that car. . . . [H]e shot the guys in the white car." Fierro said defendant was a member of a gang from Compton. Fierro denied participating in the shooting. However, one of the detectives who interviewed Fierro later testified that he considered Fierro to be a suspect as well.

Defense counsel initially objected to the admission of Fierro's statement under Evidence Code section 352. The trial court overruled the objection, and after the jury heard the evidence, defense counsel objected again, contending that the statement violated defendant's confrontation rights and Evidence Code section 356. The court overruled these objections on the basis that the statement was properly admitted as a prior inconsistent statement and as a statement of identification under Evidence Code sections 1235 and 1238, respectively. As defendant contends, the trial court erred in admitting Fierro's statement on these grounds.

### 2. *Admissibility of the Statement*

A witness's prior inconsistent statement may be admitted at trial, but only if "offered in compliance with [Evidence Code] Section 770." (Evid. Code, § 1235.) Under that provision, an inconsistent statement is not admissible unless the witness either testified and was given "an opportunity to explain or to deny the statement" or "has not been excused from giving

further testimony in the action." (Evid. Code, § 770, subds. (a) & (b).) Because neither of these conditions had been met, Fierro's statement was not admissible as a prior inconsistent statement. Evidence Code section 1238 similarly requires that the witness testify at trial before a statement of prior identification may be admitted. (*People v. Mayfield* (1972) 23 Cal.App.3d 236, 241 [100 Cal.Rptr. 104].)

Without defending the bases of the trial court's rulings, the Attorney General argues that Fierro's statement nevertheless was admissible under Evidence Code section 1294 and, if inadmissible, any error was harmless. When a trial court erroneously relies on one hearsay exception to admit evidence that otherwise would have been admissible under a different exception, it cannot be said that the evidence was admitted in error. (*People v. Fair* (1988) 203 Cal.App.3d 1303, 1309 [250 Cal.Rptr. 486], overruled on another ground in *People v. Brown* (1994) 8 Cal.4th 746, 759 [35 Cal.Rptr.2d 407, 883 P.2d 949].) "It is axiomatic that we review the trial court's rulings and not its reasoning. [Citations.]" (*People v. Mason* (1991) 52 Cal.3d 909, 944 [277 Cal.Rptr. 166, 802 P.2d 950].) That said, we conclude the statement was not admissible under Evidence Code section 1294.

Evidence Code section 1294 provides: "(a) The following evidence of prior inconsistent statements of a witness properly admitted in a preliminary hearing or trial of the same criminal matter pursuant to Section 1235 is not made inadmissible by the hearsay rule if the witness is unavailable and former testimony of the witness is admitted pursuant to Section 1291: [¶] (1) A videotaped statement introduced at a preliminary hearing or prior proceeding concerning the same criminal matter. [¶] (2) A transcript, containing the statements, of the preliminary hearing or prior proceeding concerning the same criminal matter. [¶] (b) The party against whom the prior inconsistent statements are offered, at his or her option, may examine or cross-examine any person who testified at the preliminary hearing or prior proceeding as to the prior inconsistent statements of the witness."

This recently enacted statute was intended to overrule *People v. Williams* (1976) 16 Cal.3d 663 [128 Cal.Rptr. 888, 547 P.2d 1000] by creating a new hearsay exception allowing "the statement of a person, who is unavailable as a witness, to be introduced as evidence in court if the statement was previously introduced at a hearing or trial as a prior inconsistent statement of the witness." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2483 (1995–1996 Reg. Sess.) May 8, 1996, p. 1, at <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_2451-2500/ab_2483_cfa_960506_164921_asm_comm.html> [as of Oct. 29, 2003]; see also Sen. Com. on Crim. Proc., Analysis of Assem. Bill No. 2483 (1995–1996 Reg. Sess.) July 9, 1996, p. 3, at <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_2451-2500/ab_2483_cfa_960529_111003_sen_comm.html> [as of Oct. 29, 2003].)

In *Williams*, as in this case, a person initially suspected of committing a robbery with the defendant gave a statement to the police inculpating the defendant in the crime. When that person testified at the preliminary hearing he denied making certain statements to the police. A detective testified that the initial suspect had made the inculpatory statements. The individual was not available to testify at trial, and his preliminary hearing testimony was admitted under Evidence Code section 1291, subdivision (a)(2). The detective reiterated his earlier testimony about the prior inconsistent statements, which were then admitted under Evidence Code section 1235. (*People v. Williams, supra,* 16 Cal.3d at pp. 665–666.)

The defendant argued that admission of the prior inconsistent statements violated his right of confrontation. Without reaching the greater constitutional issue, the Supreme Court held that the prior inconsistent statements were not admissible under Evidence Code section 1235 because the hearsay exception was intended to apply only to the prior inconsistent statements of a witness who testifies at trial. (*People v. Williams, supra,* 16 Cal.3d at pp. 667–669.)

■ Evidence Code section 1294 appears to have been designed to overcome the admissibility problems associated with out-of-court statements which are inconsistent with an unavailable witness's former testimony by requiring that the recorded statement be introduced at the prior hearing where the witness actually testified. It is well settled that the inherent unreliability typically associated with such out-of-court statements may be deemed nonexistent when the defendant has had an opportunity to question the declarant about the statements. (See *California v. Green* (1970) 399 U.S. 149, 158 [26 L.Ed.2d 489, 90 S.Ct. 1930].)

■ But, to be admissible at trial under Evidence Code section 1294, the recording of Fierro's statement first should have been introduced into evidence at the preliminary hearing. (Evid. Code, § 1294, subd. (a)(1).) It was not. Instead, Fierro was asked to review specific excerpts of a transcript of his interview with the police to see if it refreshed his recollection, and the prosecutor read from portions of the transcript to impeach Fierro. Detective Pittington, who questioned Fierro, also testified at the preliminary hearing that Fierro had made the statements he denied making. But neither the transcript nor a recording of the interview was introduced as evidence at the preliminary hearing. Thus, while the transcript of Fierro's preliminary hearing testimony was properly admitted at trial due to his unavailability (Evid. Code, § 1291), the court erred in allowing the jury to hear the actual recording of his statement to the police.

### 3. Defendant's Right to Confrontation

In concluding that Fierro's statement was not properly admitted under any of the relevant hearsay exceptions, we necessarily conclude the erroneous admission of that evidence violated defendant's right to confrontation. "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531], fn. omitted 448 U.S. 56.

Statements of a nontestifying accomplice typically lack such trustworthiness and are especially suspect " '[d]ue to [the accomplice's] strong motivation to implicate the defendant and to exonerate himself . . . .' [Citation.]" (*Lee v. Illinois* (1986) 476 U.S. 530, 541 [90 L.Ed.2d 514, 106 S.Ct. 2056]; see also *Lilly v. Virginia* (1999) 527 U.S. 116, 133–134 [144 L.Ed.2d 117, 119 S.Ct. 1887] (plurality opn. of Stevens, J.) [confession by a nontestifying accomplice that inculpates the defendant does not fall within a firmly rooted exception to the hearsay rule].) There is a "basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." (*Lee v. Illinois, supra,* 476 U.S. at p. 541.)

Because Fierro did not testify at trial, he was never subjected to cross-examination in regard to his entire statement. Therefore, admission of the statement violated defendant's Sixth Amendment right to confront the witnesses against him.

### 4. Harmless Error Analysis

We must next determine whether the error in admitting Fierro's statement was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) " '[I]f the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless.' [Citations.]" (*People v. Schmaus* (2003) 109 Cal.App.4th 846, 860.)

Defendant contends the jury's finding that he personally used a firearm to commit the offenses "put[] to rest any speculation that it convicted him as an aider and abettor," and he argues that "the introduction of Fierro's statement

. . . easily could have tipped the balance and persuaded one or more jurors to convict when they otherwise would have harbored a reasonable doubt." We disagree and find that, aside from Fierro's statement, the evidence of defendant's guilt was overwhelming.

Defendant's presence at the scene of the shooting was undisputed, and it was established that he had a motive to shoot the victims because he believed them to be rival gang members. Lopez and Blancas, two of the three surviving occupants of the white car, identified defendant as the shooter in photographs and at trial. Diaz, one of the occupants of the gray vehicle, gave a description of the shooter which fit defendant. While some of the evidence strongly implicated Fierro in the shooting as well, uncontradicted evidence showed that the person who fired into the white car chased after and shot at the gray car before fleeing the scene on foot. Although three witnesses described the shooter as wearing clothing similar to that worn by Fierro or as having a scar on his face, it was undisputed that Fierro left the scene in his car while defendant ran down the street.

Moreover, many of the pivotal statements Fierro made to the police were captured in the preliminary hearing testimony later read into the record at trial, thereby negating nearly all of the prejudicial effect of Fierro's recorded statement. Fierro told the police that defendant had been wearing a workshirt and gray pants, but at the preliminary hearing Fierro testified he could not remember what clothes defendant had worn, and he denied telling Detective Pittington defendant wore a workshirt. But Fierro agreed that if he previously had made such a statement it would have been the truth. During the preliminary hearing Fierro claimed he did not know if defendant was a gang member but conceded that he could have said defendant was from Compton. Fierro initially could not remember what he himself wore at the time of the shooting, but ultimately he admitted he had been wearing a white tank top and jeans.

Detective Pittington was not available to testify at trial, but his preliminary hearing testimony was read into the record in an effort to support defendant's theory that the third person he claimed had been in Fierro's car was the shooter. At the preliminary hearing, the detective also was asked about certain statements Fierro had denied making. To the extent Fierro testified he did not tell the police that defendant shot at the white car and then chased after and shot at the gray car, Detective Pittington testified that Fierro had made those statements. The detective further testified that Fierro said only he and defendant had been in Fierro's car. Fierro also told the detective that defendant had been wearing a workshirt and that he was a gang member with Compton.

Because the portions of Fierro's statement implicating defendant in the crime were covered by Fierro's and Pittington's preliminary hearing testimony, we find the error in admitting Fierro's statement was harmless beyond a reasonable doubt.

*Sufficiency of the Evidence of Premeditation and Deliberation*

Defendant contends there was insufficient evidence to show the murder and attempted murders were premeditated and deliberated. We disagree.

"In assessing a sufficiency-of-evidence argument on appeal, we review the entire record in the light most favorable to the prevailing party to determine whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80].) We apply the same standard to convictions based largely on circumstantial evidence. (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1745 [45 Cal.Rptr.2d 844].) And it is not within our province to reweigh the evidence or redetermine issues of credibility. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

There are three types of evidence generally relied upon to support a finding of premeditation and deliberation: " ' "(1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." ' [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 758 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

One of the attempted murder victims, Gomez, admitted he was a member of the Jeffrey Street gang. Other evidence showed defendant was a member of the Compton Vario 132nd Street gang and that one of his former fellow gang members had been killed in an incident involving Jeffrey Street.

Defendant also testified that he previously had been assaulted and shot in the leg and that he had told the police then that the culprits were "probably" Jeffrey Street gang members. The gang expert testified about the concept of payback within gang culture as being a retaliatory act for some wrong committed by a rival gang. Several witnesses testified that defendant made a gang-related comment before he placed the gun to Gomez's head and pulled the trigger. When it failed to fire and the victims attempted to run from the car, defendant deliberately pulled back the slide on the gun and fired it again, striking Augustin in the head and Lopez in the knee.

■ The jury could reasonably infer from this evidence that the motive for the shooting involved gang rivalry. The motive, coupled with defendant's deliberate conduct in first aiming the gun at Gomez's head and then firing the weapon at the other victims as they fled from the car, provided ample evidence to support the findings that the murder and attempted murders were committed with premeditation and deliberation. (See *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [44 Cal.Rptr.2d 686] [deliberately aiming weapon at victims whom shooter believed to be rival gang members consti-tuted sufficient evidence of premeditation and deliberation].)

*Admissibility of the Gang Expert's Testimony*

Defendant argues the trial court erred by allowing the gang expert to testify "without limitation that a gang member who 'rats' on another gang member can suffer a severe beating or death" and on the concept of paybacks. He further contends the expert's testimony improperly reinforced testimony by other witnesses, particularly that of Viramontes, who identified defendant as the shooter. We are not persuaded.

"The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [37 Cal.Rptr.2d 596].) Evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. (*Id.* at pp. 1370–1371.) "Case law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.) Here, the evidence relating to "paybacks" was relevant to the issues of motive and intent for the charged offenses and was therefore properly admitted. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [28 Cal.Rptr.2d 758].)

■ We further agree with the Attorney General that the expert's testi-mony about what it meant to be a "rat" in gang culture was relevant to help

the jury understand discrepancies between some of the witnesses' statements to the police and their testimony at trial. Such evidence generally is admissible to demonstrate that a witness may be afraid to testify truthfully because it is relevant to that witness's credibility, particularly in the face of prior inconsistent statements. (*People v. Olguin, supra,* 31 Cal.App.4th at p. 1368.) The trial court did not abuse its discretion by admitting the expert's testimony here. And to the extent defendant argues the expert bolstered Viramontes's credibility, we note that defense counsel skillfully impeached Viramontes by showing that his bail had previously been set at $50,000, and that he was nevertheless released from jail on his own recognizance two weeks before defendant's trial and also with another witness's testimony that he and Viramontes had only driven by the crime scene after the shooting.

## DISPOSITION

The judgment is affirmed.

Sills, P. J., and O'Leary, J., concurred.

A petition for a rehearing was denied December 9, 2003, and respondent's petition for review by the Supreme Court was denied February 18, 2004.