Filed 4/21/21  P. v. Pinedo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JIM PINEDO,<br><br>    Defendant and Appellant. | 2d Crim. No. B300596<br>(Super. Ct. No. 17F-10453)<br>(San Luis Obispo County) |

Jim Pinedo appeals the judgment entered after a jury convicted him of attempted second degree murder (Pen. Code,[1] §§ 187, subd. (a), 664; count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), three counts of inflicting corporal injury on a spouse or partner (§ 273.5, subd. (a); counts 3, 8, and 12), threatening a witness (§ 140, subd. (a); count 4), dissuading a witness (§ 136.1, subd. (b)(2); count 5), false imprisonment (§ 236; count 9), simple assault (§ 240; count 11), and battery (§ 243,

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

subd. (e)(1); count 13). The jury further found that in committing the attempted murder appellant intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)-(d)), and that in committing counts 2 through 5 he personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (e)). Appellant also pleaded no contest to unlawful possession of a firearm (§ 29800, subd. (a)(1); count 6), violating a domestic relations order (§ 273.6, subd. (a); count 7), infliction of corporal injury on a spouse or partner (§ 273.5, subd. (a); count 10), and making criminal threats (§ 422, subd. (a); count 14). The trial court sentenced him to an aggregate term of 39 years to life in state prison.

Appellant contends the trial court erred in denying his motion for a mistrial alleging spectator misconduct. He also raises claims of evidentiary error, prosecutorial misconduct, and cumulative error. We affirm.

## STATEMENT OF FACTS

## I.

### *Uncharged Prior Acts of Domestic Violence*

Appellant and D.C. began dating in 2010. Around July 2016, appellant slapped D.C. in the face after she called his former girlfriend C.M. a "bitch." On another occasion, appellant tied D.C.'s hand to a broom stick, turned on a torch, and set it next to the mattress on which she was lying.

In December 2014, appellant choked C.M. after discovering that she was dating someone else. C.M. reported the assault to the police, but delayed doing so because she was afraid of appellant.

2

## II.
### *July 2016 assault (count 11)*

Around July 8, 2016, appellant got into an argument with D.C. about her clothing. When D.C. tried to leave, appellant held a knife to her throat and accused her of having something to do with the recent death of his brother.

## III.
### *June 2017 Infliction of Corporal Injury (count 12)*

Around June 8, 2017, appellant punched D.C. in the temple during an argument in her bedroom. Patricia Lomeli was sleeping in an adjacent bedroom and was awakened by D.C.'s scream. Lomeli got up and knocked on the locked door to D.C.'s bedroom. Appellant hit D.C. again and told her to be quiet. D.C. told Lomeli that she was fine, but Lomeli asked her to open the door.

Daniel Monahan, who lived with D.C., heard her muffled screams. Monahan then heard Lomeli knocking on D.C.'s bedroom door and telling D.C. to open the door. Lomeli subsequently pried the door open with a butter knife and told appellant to leave, but he declined to do so. Monahan entered the bedroom, told appellant to leave, and said he should fight him rather than fighting with a woman. Appellant ran out of the room and Monahan chased him out of the house to make sure he did not return.

D.C. had a black eye, scratches or bruises around her mouth, and a lump on her forehead. She appeared to be in pain and was scared and shaking. On several prior occasions, Monahan had noticed bruising on D.C.'s chest, neck, and arms.

3

## IV.
### *Battery and Criminal Threats (counts 13 & 14)*

Sometime between May and July of 2017, appellant drove D.C. to the residential property where he lived with his mother Maria and his sister Melissa Mendia. As they were driving, appellant grabbed D.C. by the back of her head and pulled her down to his lap. Appellant walked D.C. around his property and told her he had dug a hole on the property and was going to bury her in it. As they walked toward the residence, appellant struck D.C. on the back of her head.

## V.
### *June 21, 2017 Infliction of Corporal Injury and False Imprisonment (counts 8 & 9)*

On June 21, 2017, D.C. rented a room at a motel in Paso Robles. She decorated the room with rose petals because she wanted the occasion to be romantic. When appellant arrived, he became upset about the rose petals and began arguing with D.C. He looked through her cellphone, saw something that made him angry, and began questioning and hitting D.C. She was initially afraid to leave but eventually was able to get away from appellant.

## VI.
### *June 24, 2017 Infliction of Corporal Injury (count 10)*

On the afternoon of June 24, 2017, D.C. called 911 and asked for help in a whispering voice. Appellant could be heard in background arguing with D.C., who asked appellant to stop the truck and let her go. During the call, San Luis Obispo County Deputy Sheriff Gregory Smith and his partner were able to locate appellant's truck and conducted a traffic stop. D.C. had large bruises on her biceps, scratch marks on her left elbow, and dirt

all over her pants and arms.  She appeared extremely frightened and refused to answer Deputy Smith's questions.  D.C. eventually agreed to talk after the deputy repeatedly assured her that she did not have to be afraid because he and his partner were there to help her.

D.C. told Deputy Smith that she had an argument with appellant and was able to get out of the truck.  Appellant also got out and punched her, causing her to fall to the ground, then dragged her about 20 feet back to the truck.  D.C. eventually got back into the truck because appellant had her cellphone and she did not want to get stranded.  Once she was back in the truck, she surreptitiously called 911 and left the line open.

Appellant was arrested and charged in case number 17F-06436 with inflicting corporal injury in violation of section 273.5, subdivision (a).  That same day, he was served with a domestic violence protective order (DVPO) prohibiting him from having any contact with D.C. and requiring him to stay at least 50 yards away from her.  He was subsequently released on bail.

Appellant bragged about the incident to his friend Clint Anderson and told D.C. to lie about it to the police.  Anderson advised D.C. to leave appellant, but she said she could not do so because she loved him.  D.C. also said she would do anything to defend appellant and wanted to be with him for the rest of her life.

## VII.

### *Attempted Murder and Related Offenses (Counts 1-7)*

On the morning of October 2, 2017, appellant attended a court appearance in case number 17F-06436.  Later that morning, D.C. walked into Twin Cities Community Hospital alone with a gunshot wound to her neck.  She told a nurse she

had been shot while sitting in a car in Paso Robles. She did not identify the shooter but denied that her wound was self-inflicted.

At 11:30 a.m., Deputy John Blank responded to the hospital and saw D.C. being treated in the trauma unit. By that point, she was unresponsive and could not be interviewed. Witnesses told Deputy Blank that D.C. was with a Hispanic man in his 40's when she arrived at the hospital. Surveillance video from the hospital showed D.C. near the ambulance bay at around 11:06 a.m., then entering the front door of the emergency room shortly thereafter. Around the same time, a gold SUV could be seen driving by the front door of the emergency room.

Later that day, D.C. was transported to another hospital for treatment. She was intubated and remained in a coma for 10 days. The bullet in her neck, which consisted of multiple fragments, was never removed from her body.

Appellant owned and drove a gold Nissan SUV. D.C.'s blood was subsequently found on the vehicle's front passenger seat, and her purse, shoes, and work name tag were inside the vehicle.

### a. *D.C.'s Statements and Conduct After the Shooting*

On October 12, 2017, San Luis Obispo Sheriff's Detective Jason Hall interviewed D.C. at the hospital. A recording of the interview was played for the jury at trial. D.C. told Detective Hall that on the morning of October 2, appellant and another man drove her to the courthouse where appellant had an appearance in case number 17F-06436. D.C. spoke to appellant's attorney and said she was going to recant her statements that appellant had assaulted her. After appellant's hearing, he and D.C. returned to appellant's residence and went to a shed on the property where they often spent time together. Appellant was

6

angry with D.C. because he thought she had not done enough to recant her accusations against him. As D.C. was sitting on a couch in the shed, she heard a gunshot and ringing. She looked over and saw appellant pointing a rifle at her from approximately six feet away. Appellant fired the gun again and hit D.C. in the neck. D.C. never told the detective that she shot herself or had attempted to do so.

D.C. was released from the hospital on October 15. On October 17, D.C. had a Facebook Messenger conversation with her friend Anissa Gutierrez. D.C. told Gutierrez, "I got shot by the guy I was seeing." When asked where appellant had shot her, D.C. replied, "He shot me at his house [in] my neck." In another conversation that same day, D.C. stated "I thought for sure I was done for when he shot me." She went on to state that appellant "has me so fucked up in the head" and that "[h]e really fucked me up."

On October 18, appellant had a Facebook Messenger conversation with Juan Hernandez. Hernandez asked D.C., "[W]hat the hell were you doing? He had whooped you before and you still went back." D.C. replied, "I know. I was stupid." D.C. later stated "I got shot" by "a guy I was seeing" because "[h]e's crazy." In another Facebook Messenger conversation that same day with Beverly Burch, appellant said, "I remember everything."

On October 20, Detective Devashish Menghrajani came into contact with D.C. during a search of the property where appellant lived. D.C. told Detective Menghrajani that on the day of the shooting she was sitting on the couch in the shed while appellant was standing up. The next thing she recalled was walking out of the shed while bleeding from her neck. Appellant then took her to the hospital in a gold SUV. D.C. denied that she

7

had attempted to commit suicide and said she would never do so and that her mother would know this. She never told the detective she was attempting to shoot herself or that the gun accidentally fired when appellant tried to grab it from her. She told the detective that she still often pictured appellant holding the gun with which she was shot, but then tried to retract the statement. Detective Menghrajani got the impression that D.C. was not telling him everything.

When D.C. spoke with Detective Hall again later that same day, she admitted that she lied when she told Detective Menghrajani she did not remember what had happened and that what she had previously told Detective Hall during her October 12 interview was truthful. She lied to Detective Menghrajani because she still loved appellant and wanted to protect him. She characterized it has a "sick kind of love," acknowledged that appellant had a lot of control over her, and said she wished she could hate him and stop thinking about him.

On October 25, D.C. met with San Luis Obispo County District Attorney Investigator Rosalba Denny. D.C. told Denny that just prior to the shooting, appellant had been upset with her because he believed she had not done enough to recant her accusations against him. She mentioned that appellant had a rifle and fired two shots, the second of which hit her. She said she kept going back to appellant because she loved him and asked, "How do you love someone who doesn't love you back? Because, I mean, he shot me?" That same day, D.C. stated in a Facebook message that "[m]y heart hurts from having to face the realization that this guy who I love so much thought of me as nothing."

On November 1, D.C. had a Facebook Messenger conversation with Dawn Holloway. Holloway asked if D.C. was okay and D.C. replied "[y]es, as good as I can be. He almost killed me. I was in a coma for two weeks." In a November 11 Facebook message, D.C. stated that she missed appellant and added "I am stupid. I know." She also stated "the[re] was a domestic violence case and retraining order he broke when he shot me." On November 13, D.C. stated in a Facebook Messenger conversation that she "got shot by the guy [she] was seeing . . . with a .22 rifle" from eight feet away, that he shot her after she had gone to court "trying to get him cleared by saying [she] lied," and that she "went to see him after he shot [her]" and wanted "to save him from going to jail."

On November 16, D.C. attended one of appellant's pretrial hearings. Appellant's sister Melissa Mendia entered the courtroom, sat next to D.C., and hugged her. At some point, they left the the courtroom together and Denny saw them speaking outside. Denny was concerned that Mendia might be trying to dissuade D.C. from testifying against appellant. Denny approached D.C. and asked if she could talk to her alone. When asked how she was feeling about the case, D.C. replied that "it wasn't that he shot her but that . . . he pointed the gun at her." D.C. then resumed her conversation with Mendia.

On November 27, D.C. stated in a Facebook Messenger conversation "I'm in love with the person who shot me." In a December 5 Facebook Messenger conversation, D.C. stated "[h]e shot me in the neck" and added "I'm in love with him [I'm] stupid but love can't be turned off with a switch." When asked how she could love someone who had tried to kill her, D.C. replied "[l]ook, all I know is I do."

9

On December 9, D.C. sent an email to the District Attorney's victim advocate stating that she did not feel protected and was recanting her allegations against appellant and would not testify against him at his upcoming preliminary hearing. D.C. sent a similar email to Denny on December 15. When Denny spoke to D.C. on the phone later that same day, D.C. said she was spending time with appellant's family but did not feel comfortable around them because she did not know their intentions. In a Facebook Messenger conversation that same day, D.C. stated "the pain I'm going through is not from the gun. It's from family. It's the whole court issue. It's being in love with someone who tried to kill me. Because I do love him and my heart hurts for him."

On December 30, Monahan met with D.C. at D.C.'s request. Monahan asked D.C. if it had "anything to do with the D.A. investigator trying to get in touch with [him]," and D.C. replied in the affirmative. D.C., who did not know that Monahan had already talked to the investigator, told him not to do so and asked him not to testify against appellant because she still loved appellant and did not want him to go to prison. D.C. also expressed concern that if Monahan testified she would be charged with perjury.

### b. *Appellant's Post-Crime Statements and Conduct*

Michael Davenport lives on property adjacent to the property where appellant lived. On the afternoon of the shooting, Davenport noticed that appellant's gold SUV was parked on his property. Davenport contacted appellant's mother Maria and asked her to have the vehicle moved, but no one did so. About a week later, Davenport removed the vehicle from his property with a forklift and placed it on the street. On October 9, the

10

vehicle was deemed abandoned and was towed from the street at the request of the California Highway Patrol.

On December 27, appellant told Maria and Mendia during a telephone call from jail that D.C. was "doing her job" and that he wanted her to stay with them. After D.C. joined the conversation, appellant said he had sent a messenger with a letter to Mendia and asked D.C. to talk to Mendia. In another phone call the following day, appellant proposed to D.C. and she accepted. Appellant told D.C., who had a recent history of methamphetamine abuse, that she needed to use drugs one more time and told her to tell everyone she had done so. During the same call, appellant told Mendia that D.C. "needs to go dirty."

During a December 29 phone call, appellant told Mendia she was not doing enough to help him and told her to talk to "Chicotorrin" and "do whatever it takes." Chicotorrin is the nickname of Imeldo Mercado, who lived on the the same property as appellant, Maria, and Mendia. Appellant told Mendia she needed to talk to Mercado because law enforcement was going to contact him and told D.C. to "go over there." During a January 2, 2018 phone call, appellant told Mendia to tell Mercado "all he [had] to say" was that appellant was not at the property when the shooting occurred and that he had not heard any gunshots that day.

### c. D.C.'s Preliminary Hearing Testimony

At the preliminary hearing, D.C. testified she that she had come to the courthouse with Maria and Mendia, that she did not want to testify, and that she was recanting her statements against appellant. In response to the prosecutor's questions, D.C. answered "I don't know" or "I don't remember." Under questioning by defense counsel, D.C. testified that on the day of

11

the shooting appellant told her he was going to end their relationship because he had discovered she was using methamphetamine. D.C. claimed that she picked up a rifle to shoot herself and told appellant she was going to do so, and that the rifle accidentally fired when appellant tried to pull it away from her. According to D.C., she lied to the police about the circumstances of the shooting because she was angry that appellant had simply dropped her off at the hospital and was not there when she awoke from her coma. She also claimed that she had lied about the prior incident of domestic violence for which appellant had been charged in case number 17F-06436. On redirect, she admitted that she never told the police she had tried to kill herself and also acknowledged her prior statements to Detective Hall.

## VIII.
### *Expert Testimony*

Dr. Joye Carter, a forensic pathologist with the coroner's division of the San Luis Obispo Sheriff's Department, opined among other things that D.C.'s injuries were consistent with D.C. being upright and the gun being held above her neck when she was shot.

Richard Ferry, a marriage and family therapist, offered expert testimony on domestic violence and intimate partner battering. Among other things, Ferry testified that victims of domestic violence often recant their accusations in an effort to protect their abuser.

12

## DISCUSSION
### *Mistrial Motion*

Appellant contends the trial court erred in denying his motion for a mistrial based on the spectator misconduct of D.C., Mendia, and Maria. We are not persuaded.

"Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022.) Trial courts exercise broad discretion in deciding whether spectator misconduct is prejudicial. (*Id.* at p. 1024.) The court may deny a motion for mistrial based on spectator misconduct where it is "satisfied that no injustice has resulted or will result from the events of which the complaint ensues." (*People v. Slocum* (1975) 52 Cal.App.3d 867, 884.)

Prior to trial, the court told D.C. that she was not permitted to be in the courtroom during trial and ordered her not to speak to any witnesses about the case. During trial, the court admonished the jury not to talk to or allow themselves "to be addressed by any person with regard to any matter concerned with the trial."

One morning during trial, Juror 10 sent the court a note stating "[w]e would like to make you aware that the 'victim' in this case is invading our space and staring at us, which is quite intimidating. The 'sister'? walked by one juror and physically moved her out of the way."

After showing the note to the attorneys, the court noted that during the last recess the prosecutor had expressed her concern that D.C. was out in the hallway in close proximity to the jurors and that her attorney had been summoned to court to

13

address the situation. The court also told D.C.'s attorney to tell her she was not allowed to intimidate or interfere with the jurors.

When Juror 10 was questioned about the note, she said that some of the jurors were talking in the hallway when they noticed that D.C. and Maria were staring at them. As the jurors were leaving the prior Friday, Juror 10 said goodbye to Juror 11 and D.C. and Maria replied "[b]ye, thanks. You too." Juror 10 mentioned the incident to the bailiff to make sure the court knew she was not speaking to D.C. or Maria. Juror 10 also stated that D.C. and Maria had been near the jurors and staring at them since almost the beginning of trial. Juror 10 also recounted an incident in which Mendia had walked by Juror 3 and physically moved her out of the way. Juror 10 assured the court that these incidents would have no impact on her ability to be a fair and impartial juror.

The court proceeded to individually question each of the jurors about the issue. Juror 3 told the court that it was Juror 1 who had been physically moved by Mendia. Juror 3 recounted that D.C., Mendia, and Maria "had walked close to us" and characterized the situation as "uncomfortable." Juror 3 stated that nothing about the incident would affect her ability to be fair to both sides in the case, and agreed to follow the court's instruction not to allow anything that happened outside the courtroom to affect her decision.

Juror 1 recounted that D.C. and Maria were "making an attempt to hover around the jurors" and were talking about and pointing at them. D.C. also touched Juror 1 while walking past her, but Juror 1 just moved out of her way. Juror 1 assured the court that nothing about these behaviors and observations would affect her ability to be fair and impartial, and that she would not

14

allow anything that happened outside the courtroom to affect her decision.

Juror 2 recalled an incident in which jurors had "tripp[ed] over" D.C. and Maria as they were all leaving at the same time. Juror 4 had not witnessed any situation in the hallway, but had seen D.C. and Maria in the hallway and it "just kind of felt a little too close for comfort." Juror 5 had seen D.C., Maria, and Mendia in the hallway together and said the jurors tried to move away from them "because it kind of gets uncomfortable when they stay right here in front of the jury." Juror 6 recalled "a lot of close contact and a lot of staring." Jurors 7 and 9 had not observed anything unusual. Juror 8 had not seen any contact between jurors and witnesses, but noted that appellant's family was "hanging around and constantly looking at" the jurors. Juror 11 noted that Juror 10 had told her about the incident in which D.C. and Maria had said goodbye to her. Juror 12 had observed D.C. touch a woman's arm as they were walking toward the courtroom. Each of the jurors stated that nothing they had heard or observed outside the courtroom would affect their ability to be fair and impartial jurors, and that they understood and would follow the court's instructions on that issue. All four alternate jurors made similar statements.

Defense counsel moved for a mistrial, asserting that the jurors had been exposed to "erroneous information" and an "improper display" of the relationship between D.C. and appellant's family. Counsel argued that notwithstanding each jurors' assertions to the contrary, their observations would affect how they evaluated the prosecution's upcoming evidence that appellant's family was trying to influence D.C. In opposing the motion, the prosecutor rejected the assertion that the jurors had

been exposed to "erroneous information" and noted that each juror and alternate juror had indicated they were not influenced by anything they had heard or observed and would follow the court's instructions to disregard any such information. The court found the jurors' and alternate jurors' representations credible and accordingly denied the motion for a mistrial. The court subsequently denied a motion for a new trial brought on the same grounds.

The court did not abuse its discretion in denying either motion. In arguing to the contrary, appellant essentially argues that the court could not credit the jurors' assurances that what they had seen or heard would not affect their ability to be fair and impartial jurors, and that they would follow the court's instructions on that issue. We agree that the court conducted a sufficient inquiry into the matter. Moreover, the court had the opportunity to observe each juror's demeanor and found each of them credible. Nothing in the record provides a basis for us to reject these credibility determinations. (*People v. Harris* (2008) 43 Cal.4th 1269, 1304-1305.) Nor does appellant offer anything to overcome the presumption that each juror understood and followed the court's instructions on the issue. (*People v. Melendez* (2016) 2 Cal.5th 1, 33.) Accordingly, appellant fails to demonstrate that the denial of his mistrial motion was an abuse of discretion.

### D.C.'s Statements Regarding Suicide

Appellant contends the trial court erred in admitting evidence of D.C.'s prior statements to Detective Menghrajani regarding the fact that she would not attempt to commit suicide. We conclude the evidence was properly admitted as prior inconsistent statements under Evidence Code section 1294.

16

Evidence Code section 1294 provides in pertinent part: "(a) The following evidence of prior inconsistent statements of a witness properly admitted in a . . . preliminary hearing[,] or trial of the same criminal matter pursuant to [Evidence Code] Section 1235 is not made inadmissible by the hearsay rule if the witness is unavailable and former testimony of the witness is admitted pursuant to Section 1291: [¶] . . . [¶] (2) A transcript, containing the statements, of the . . . preliminary hearing[] or prior proceeding concerning the same criminal matter."[2] The statute "appears to have been designed to overcome the admissibility problems associated with out-of-court statements which are inconsistent with an unavailable witness's former testimony by requiring that the recorded statement be introduced at the prior hearing where the witness actually testified. It is well settled that the inherent unreliability typically associated with such out-of-court statements may be deemed nonexistent when the defendant has had an opportunity to question the declarant about the statements." (*People v. Martinez* (2003) 113 Cal.App.4th 400, 409.)

---

[2] Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." Evidence Code section 770 provides in relevant part that "[u]nless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or deny the statement."

17

A prior inconsistent statement admitted under Evidence Code section 1294 "is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.  The 'fundamental requirement' of section 1235 is that the statement in fact be inconsistent with the witness's . . . testimony.  [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, footnote and italics omitted.)  "'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement."  (*Ibid.*; *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1076.)  A trial court's decision to admit such evidence "is a matter committed to its discretion '"and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'  [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 585.)

In her October 20, 2017 interview with Detective Menghrajani, D.C. stated:  "The last thing that—from what everybody believes is that they knew I was there with [appellant] and that's why everybody's going after the fact that—I—they all know I'm not going to commit suicide.  Kay, even my mom's like, she loves herself way [too] much in order to do something like that.  But, she—everybody's knowing it's not suicide—they know his mom wouldn't do it or his sisters, so who else could it possibly be."  When D.C. was confronted with this statement at the preliminary hearing, she replied, "[t]hat was not said. . . .  I know I did not say that."  Detective Menghrajani subsequently testified at the preliminary hearing that D.C. had told him "she would not commit suicide," that "she want[ed] to live," and that "her mother also knows that she would not want to commit suicide."

18

At trial, the prosecution moved to admit D.C.'s prior statements under Evidence Code section 1294, on the ground that those statements were inconsistent with her preliminary hearing testimony that her gunshot wound was the result of her attempt to commit suicide. Appellant objected on grounds of lack of foundation, hearsay, relevance, vagueness, and speculation. Defense counsel argued that D.C.'s statements were not inconsistent with her preliminary hearing testimony that she had attempted to commit suicide, but rather merely reflected the perception of her family members that she would not do so. The court admitted the evidence, agreeing with the prosecution that the statements were more than a mere opinion regarding what other family members might believe about the issue. Although Detective Mengharajani's testimony on the issue was not identical to what D.C. had actually said, the court concluded that it was similar enough to warrant admission and that appellant had a full and fair opportunity to cross-examine D.C. about the statement at the preliminary hearing.

The court did not abuse its discretion. D.C. adamantly denied making prior statements that had been both recorded and transcribed. Instead of claiming that her comments were not meant to convey that she had not attempted to commit suicide, she simply denied making them. Moreover, a reasonable trier of fact could conclude that her recorded statements were inconsistent with her belated claim that she had tried to kill herself. She did not state that everyone *thought* she would not commit suicide, but rather that everyone "*knew*" she would not do so. Although she did not expressly state that she had not committed suicide and would never attempt to do so, such an express statement was not a prerequisite to admissibility under

19

Evidence Code section 1294. (*People v. Johnson, supra*, 3 Cal.4th at p. 1219.) To the extent that Detective Menghrajani's testimony differed from what D.C. actually said, the jury was also presented with the actual statements and defense counsel had the opportunity to exploit those differences.

Moreover, any error in admitting the statements was plainly harmless. Appellant characterizes the alleged error as a violation of his due process rights, but he raised no such claim below. Accordingly, his constitutional claim is forfeited. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1125.) In any event, the error would be harmless regardless of the standard of review. We agree with the People that "appellant overstates the significance of the challenged evidence, which was a minor aspect of the prosecutor's compelling case and was mentioned just briefly during a lengthy closing argument." The evidence of appellant's guilt was overwhelming, and D.C.'s belated claim that she had tried to commit suicide was patently incredible. Among other things, her testimony on this issue was impeached by her own prior statements to the police, as well as her statements in numerous Facebook conversations that were admissible to impeach her credibility under Evidence Code section 1202. (See *post*, pp. 22-25.)

In a related claim, appellant asserts that the prosecutor committed misconduct by offering the challenged evidence— which he characterizes as "false"— and by "failing to correct the false evidence, and reinforcing the prejudice arising from that error by highlighting that evidence in closing argument." Appellant did not make any such objection in the trial court, so the claim is forfeited. (*People v. Bemore* (2000) 22 Cal.4th 809, 845-846.) Appellant fails to establish that any objection would

have been futile.  In any event, the challenged evidence was properly offered and admitted, and the prosecutor's references to that evidence during closing argument were entirely proper. (See, e.g., *People v. Lucas* (1995) 12 Cal.4th 415, 473 [recognizing that "[p]rosecutors have wide latitude to discuss and draw inferences from the evidence at trial"].)  Moreover, the jury was instructed that counsels' arguments were not evidence and we presume the jury understood and followed those instructions. (*People v. Bennett* (2009) 45 Cal.4th 577, 614 (*Bennett*).)

### D.C.'s Facebook Messages

Appellant contends the court erred in admitting evidence of numerous statements D.C. made in Facebook messages after the shooting.  The prosecution offered the statements to impeach D.C.'s testimony at the preliminary hearing pursuant to Evidence Code section 1202,[3] and as evidence of her state of mind under Evidence Code sections 1250 and 1251.[4]  The trial court

---

[3] Evidence Code section 1202 states in pertinent part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or deny such inconsistent statement or other conduct.  Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

[4] Evidence Code section 1250 provides in pertinent part: "(a) . . . [E]vidence of a statement of the declarant's then existing state of mind . . . is not made inadmissible by the hearsay rule when:  [¶]  (1) The evidence is offered to prove the declarant's

concluded that the messages were not admissible under Evidence Code section 1202, but were admissible to prove her state of mind under Evidence Code sections 1250 and 1251.[5]

Appellant claims that although the messages were not offered for the truth of the matters asserted and the jury was so instructed, "jurors were compelled to assess whether [D.C.'s] Facebook statements were truthful in order to consider that evidence as proof of [D.C.'s] state of mind. . . .  In some instances, messages included [D.C.'s] beliefs and recollections of the shooting, and her speculation of appellant's intent, resulting in deprivation of appellant's right to due process."

state of mind . . . when it is itself an issue in the action; or  [¶]  (2) The evidence is offered to prove or explain acts or conduct of the declarant.  [¶]  (b) This section does not make admissible evidence of a statement or memory or belief to prove the fact remembered or believed."  Evidence Code section 1251 states in pertinent part:  "[E]vidence of a statement of the declarant's state of mind . . . at a time prior to the statement is not made inadmissible by the hearsay rule if:  [¶]  (a) The declarant is unavailable as a witness; and  [¶]  (b) The evidence is offered to prove such prior state of mind . . . when it is itself an issue in the action and the evidence is not offered to prove any fact other than such state of mind."

[5] D.C.'s October 17, 2017 Facebook message (Exhibit 31A), in which she stated "I got shot by the guy I was seeing" and "[h]e shot me at his house in my neck[,]" was admitted for the truth of the matters asserted pursuant to Evidence Code section 1370. Appellant does not challenge this ruling on appeal, although he asserts that the statements "did not establish the shooting was intentional as opposed to accidental."

22

We agree with the People that the trial court erred in concluding that the statements were not admissible to impeach D.C.'s credibility under Evidence Code section 1202. The court reasoned that the statements could not be admitted under that section because appellant had no opportunity to cross-examine D.C. about them.

This conclusion is contrary to the express language of Evidence Code section 1202, which makes clear that the inconsistent hearsay statements of a declarant who does not testify at trial are admissible to impeach his or her credibility even though the declarant "is not given and has not had an opportunity to explain or to deny such inconsistent statement[s]." As our Supreme Court has recognized, "'[Evidence Code s]ection 1202 deals with the impeachment of a declarant whose hearsay statement is in evidence as distinguished from the impeachment of a witness who has testified. It clarifies two points. First, evidence to impeach a hearsay declarant is not to be excluded on the ground that it is collateral. Second, the rule applying to the impeachment of a witness—that a witness may be impeached by an inconsistent statement only if he [or she] is provided with an opportunity to explain or deny it—does not apply to a hearsay declarant.' [Citation.]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 806, fn. 22, italics omitted (*Blacksher*).)

Evidence Code section 785, which was enacted as part of the same bill that enacted Evidence Code section 1202, allows the credibility of a witness to be attacked by any party. (*Blacksher*, *supra*, 52 Cal.4th at p. 807; *People v. Osorio* (2008) 165 Cal.App.4th 603, 616-617 (*Osorio*).) "Because the Legislature did not expressly make Evidence Code sections 785 and 1202 mutually exclusive, *Osorio* concluded that both sections should be

23

read together and as a single statute, these two sections allow a prosecutor to use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced.' [Citation.]" (*Blacksher*, at pp. 807-808.) "[T]he result in *Osorio* was . . . correct. The inconsistent statements at issue in *Osorio* were not hearsay because they were not admitted for their truth. Accordingly, the defendant's inability to cross-examine the declarant about those statements raised no confrontation clause concerns." (*Blacksher*, at p. 808; see also *id.* at fn. 23.)

D.C. refused to testify at trial. At the preliminary hearing, she recanted what she had told the police and claimed she had been accidentally shot while attempting to commit suicide. In his opening statement, appellant's attorney made clear to the jury that the defense would be relying on D.C.'s preliminary hearing testimony. Because the defense put D.C.'s credibility at issue, the prosecution could properly attack her credibility during its case-in-chief. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1085.) Evidence Code sections 785 and 1202 permitted the prosecution to attack D.C.'s credibility with her prior inconsistent statements. (*Blacksher*, *supra*, 52 Cal.4th at p. 807.) There were no confrontation clause concerns because the statements were not offered for their truth. (*Id.* at p. 808.) Moreover, the jury was instructed that the statements were not admitted for their truth and we must presume the jury understood and followed those instructions. (*Bennett*, *supra*, 45 Cal.4th at p. 614.)[6]

---

[6] Prior to admitting evidence of the first Facebook message (People's Exhibit 29A), the court told the jury: "You're going to be hearing a number of statements that are attributed to . . . [D.C.'s]

Because the statements were admissible to impeach D.C.'s credibility under Evidence Code section 1202, we need not decide whether the statements were also admissible to prove D.C.'s state of mind under Evidence Code sections 1250 and 1251.  (See *People v. Martinez* (2003) 113 Cal.App.4th 400, 408 ["When a trial court erroneously relies on one hearsay exception to admit evidence that otherwise would have been admissible under a different exception, it cannot be said that the evidence was admitted in error"].)  In any event, we agree with the People's assertion that "[e]ach and every one of the challenged Facebook messages" were properly admitted as "evidence of her actual state of mind or beliefs about the shooting, which in turn impeached the credibility of her preliminary hearing testimony."

---

Facebook account.  I want to make sure that you all understand that these are out-of-court statements that were allegedly made by [D.C.] to a number of different individuals on prior occasions.  The statements are being offered only to show her state of mind and to explain her acts or conduct.  If you conclude that she made the statements, you may not use the statements as proof that the information contained in the statements is true, nor may you use it for any other reason.  They are simply being offered to show her state of mind or to explain her acts or conduct.  Okay.  And that's going to be true as to all of these items that you are about to see."

At the conclusion of the trial, the jury was instructed pursuant to CALCRIM No. 303 as follows:  "During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other.  Evidence was admitted of out-of-court statements made by [D.C.] to show her state of mind and to explain her acts or conduct.  If you conclude she made the statements, you may not use the evidence as proof that the information contained in her statements is true, nor may you use it for any other reason."

25

Contrary to appellant's claim, none of D.C.'s Facebook messages were admitted to prove any fact remembered or believed as set forth in subdivision (b) of section 1250. To the extent appellant claims that some of the statements were vague, speculative, cumulative, or otherwise unduly prejudicial, the court did not abuse its discretion in concluding otherwise. To the extent appellant complains that he was deprived of the opportunity to cross-examine statements made by the individuals with whom D.C. was communicating in her messages, the court properly found that those statements were admissible to give context to D.C.'s statements. (*People v. Davis* (2005) 36 Cal.4th 510, 536.)

Moreover, this case presents a classic example of a domestic violence victim recanting her accusations in an effort to protect her abuser. Even if the Facebook messages had been excluded, the evidence of appellant's guilt would be overwhelming. Accordingly, any error in admitting the messages would be harmless regardless of the standard of review.

For the first time on appeal, appellant also contends the prosecutor committed misconduct in discussing D.C.'s Facebook messages during closing argument. The claim is forfeited, and appellant fails to demonstrate an objection would have been futile. (*People v. Bemore*, *supra*, 22 Cal.4th at pp. 845-846.) Moreover, the evidence of D.C.'s Facebook messages was properly admitted, the jury was properly instructed on the limited admissibility of that evidence, the prosecutor's comments on the evidence fell within the permissible range of legitimate advocacy, and the evidence of appellant's guilt was overwhelming.

26

### *Cumulative Error*

Appellant finally contends that the cumulative effect of the alleged errors compels reversal of the judgment.  Because we reject each assignment of error, appellant's claim of cumulative error necessarily fails.  (*People v. Grimes* (2016) 1 Cal.5th 698, 737.)

### DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P.J.


YEGAN, J.

27

Jacquelyn H. Duffy, Judge
Superior Court County of San Luis Obispo

_____

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Joseph P. Lee, and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.