Filed 8/20/24  P. v. Ayala CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330104 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. Nos. LA090973, LA092117) |
| v. | |
| VALENTINE AYALA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant Valentine Ayala.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Pedro Alvarez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Pedro Alvarez and Valentine Ayala of assaulting Alex Ibarra and Jasper Cendejas with a firearm and attempting to murder them.  On appeal, Alvarez and Ayala contend that (1) the trial court abused its discretion in admitting gang evidence; (2) substantial evidence did not support the convictions in which Cendejas was the victim; and (3) the trial court prejudicially erred in failing sua sponte to modify CALCRIM No. 875, the jury instruction providing the elements for assault with a firearm, to clarify that each victim must have been subject to the application of force.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.      *The First Amended Information*

The first amended information charged Alvarez and Ayala with the attempted willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] of Ibarra (count 1) and Cendejas (count 2); and assault with a firearm (§ 245, subd. (a)(2)) on Ibarra (count 3) and Cendejas (count 4).  It alleged for all counts against Alvarez and Ayala that a principal had been armed with a firearm.  (§ 12022, subd. (a)(1).)  As to Alvarez only, the first amended information alleged that he personally used a firearm (§ 12022.5, subds. (a) & (d)), personally inflicted great bodily injury upon Ibarra (§ 12022.7, subd. (a)), and personally and intentionally discharged a firearm causing great bodily injury to Ibarra (§ 12022.53, subds. (d) & (e)(1)).

---

[1]      All undesignated statutory references are to the Penal Code unless otherwise indicated.

2

## II.   *The People's Evidence at Trial*
### A.   *The July 2019 shooting*

At trial, the People presented the testimony of over 15 witnesses over the course of several days in March 2023. Robinson Bueno Olivares (Bueno) testified that, on July 21, 2019, at 4:50 p.m., he was in the front yard of his home on Baird Avenue when he saw "two guys walking on the sidewalk" and "another two guys chasing these two guys." Bueno explained that the two in the front were walking a little faster than normal, and the two in the back appeared to try to "catch[ ] these two guys." The shorter of the two in the back, who was wearing a white shirt, screamed, "Hey," not in a friendly tone, as well as other words and something to the effect of "Homies" in a very loud voice, to the two in the front.

According to Bueno, "[a]s soon as these guys stopped say that words," the taller of the two in the back, who was wearing a dark shirt, "opened fire on the two guys in the front" from a distance of about 35 to 45 feet. As the taller man moved forward shooting, the shorter man with him also moved forward. When the taller man stopped shooting, he and the shorter man turned at the same time. The taller man looked at Bueno and started to run. He and the shorter man ran back the way they came. As for the two in the front, one ran straight ahead and the other turned to the right when the shooting began.

At trial, Bueno initially was unable to identify anyone in the courtroom, including Alvarez and Ayala, as either the shooter or the shorter man in the back. But Bueno acknowledged that he had identified Alvarez as the shooter at preliminary hearings in January and March 2020. On cross-examination, Bueno testified that the shorter man (who he had said wore a white shirt) had no

3

gun, but admitted that, a day after the shooting, he told a detective it was the man in the white shirt who fired the gun. On redirect, he explained he had noticed the two men in the back more by their height than by what they were wearing. He also testified he now recognized Alvarez. He explained he previously had difficulty identifying anyone in the courtroom because everyone had been wearing a mask. Although Alvarez at one point had pulled his mask down, Bueno had not identified Alvarez right away because it had taken some time for Bueno to recognize him.

The court asked Ayala to remove his mask. Bueno recognized Ayala as well, but identified Alvarez as the taller man with the gun.

Ibarra testified that on July 21, 2019, he was walking on Baird Avenue with Cendejas when he got shot in the arm. After he got shot, he ran to Reseda Boulevard with Cendejas and sat behind a van. Ibarra claimed not to remember what happened before he was shot. He denied hearing anyone say anything to him when he was walking with Cendejas. He denied talking to a detective named Guillermo about what happened that day.

Ibarra did not recall testifying at the January 2020 preliminary hearing that he heard the men behind him yelling, "What's up?" He did not recall testifying that he was a member of the West Side Reseda gang; that the West Valley Crazys was his gang's rival and "enemy"; and that if a West Valley Crazys member were to come up to him and say, "What's up?" he would take that to be a threat. He did not recall previously testifying that, during the shooting, he turned and saw that the taller man had a revolver. At trial, he could not say whether the individual who shot him was in the courtroom.

4

Detective Zoraya Guillermo testified she investigated gang crimes for the Los Angeles Police Department and was the lead investigator on the case. She interviewed Ibarra at the hospital on July 22, 2019. Ibarra told her he did not know or remember who he was with or where he was when he had been shot. The detective was not surprised by Ibarra's claimed lack of memory because, in her experience as a gang detective, gang members "won't tell you who did anything to them because . . . snitches get stitches." Ibarra eventually told the detective that he was with Cendejas; Ibarra heard a male voice yell, "What's up?"; Ibarra heard gun shots and ran; and Ibarra was shot in the arm.

At trial, Cendejas denied knowing Ibarra and spending time with him. He said he was not with Ibarra when Ibarra was shot. Asked if he had testified in January 2020, he first denied having done so and then said he did not remember. He denied coming to court in January 2020 and testifying that he "got shot at."

Cendejas further denied that, on August 2, 2019, he had talked with an officer (Officer Steven Bakewell) about the shooting. Cendejas denied telling Officer Bakewell details about the day of the shooting. He denied telling the officer that he thought the suspects were from the West Valley Crazys or "CYS." He testified at trial that he did not know what the West Valley Crazys were or what "CYS" was.

**B.     *The August 2019 Cendejas interview***

The jury was shown a video of Cendejas's August 2, 2019 interview with Officer Bakewell. The trial court admitted that video and a transcript of the interview into evidence, as Exhibits 9 and 10, with no objection from the defense.

During the interview, Officer Bakewell asked Cendejas about the incident that had taken place when Cendejas was walking down Baird Avenue with his "homeboy, Alex," about a week before the interview.  Cendejas explained that he and Alex were walking when "we just started gettin'—gettin' shot at." Cendejas heard several "pops."  He and Alex ran to Reseda Boulevard.  Alex had been shot in the arm.  Cendejas stayed with Alex until the police and ambulance came, and then Cendejas left without talking to the police.  Cendejas said the shooting was "most likely" by "CYS" because "we're going at it right now."  Alex and Cendejas were "beefing" with "the Crazys."

C.    ***The surveillance videos and the shirt with Alvarez's DNA***

Los Angeles Police Officer Hector Banuelos responded to the crime scene and recovered video surveillance of an area on Baird Avenue immediately south of where the shooting happened.  The court admitted three surveillance videos into evidence without objection.  One video, which was played before the jury, showed Ibarra and Cendejas walking northbound next to each other on the sidewalk along Baird Avenue.  They were followed by Alvarez and Ayala, who appear in the video less than 30 seconds after the victims appeared.  At two minutes and 17 seconds, when the four individuals were no longer in the video's field of view, five gun shots could be heard on the video.  By no later than two minutes and 37 seconds, Alvarez and Ayala run back into view going southbound on Baird Avenue.

Another witness heard loud gun shots in his neighborhood on July 21, 2019.  He came out of his house and saw two men running away.  One of them had just closed the lid on the witness's trash can.  The witness found a shirt in the trash can.

6

The shirt contained a mixture of four people's DNA, and Alvarez was included as one of the DNA contributors. Alvarez was one quintillion times more likely to be a contributor than a random person.

### D.    *Gang-related evidence*

The West Valley Crazys is a prominent gang whose rivals included the West Side Reseda and South Side Reseda gangs. West Side Reseda and South Side Reseda merged and became "Reseda Trece," or Reseda 13. Reseda 13 members also refer to themselves as West Side Reseda or South Side Reseda. The shooting was in territory claimed by Reseda 13. It was a disputed area that overlapped with territory claimed by the West Valley Crazys. Officer Banuelos described it as a "spill-over area" where "Crazys come into Reseda's territory."

Ayala was a West Valley Crazys member. He had "CYS," which stands for "Crazys," and "WV," which stands for "West Valley," tattooed on his head. Ayala had been seen with known West Valley Crazys members Nicholas Rubalcaba and Aaron Lopez at least as far back as 2015. As of 2018, he had been a member for 10 years.

In 2019, Jorge Soto, a West Valley Crazys member, was shot and killed. Rubalcaba, Lopez, Ayala, and Alvarez attended Soto's funeral.

In February 2019, Detective Jason Haggis interviewed Alvarez as a potential witness in the Soto case because Alvarez had been at the location of Soto's shooting. Alvarez told the detective he and Soto were very close. Alvarez was upset and, at times, despondent during the interview.

Franklin Hernandez, a member of Reseda 13, was charged with Soto's murder. On June 12, 2019—three weeks after the

prosecutor presented evidence at Hernandez's preliminary hearing—Jose Espinoza, a Reseda 13 member who went by the moniker Mousie, was shot and killed. Three West Valley Crazys members, including Rubalcaba and Lopez, were identified as suspects in Espinoza's shooting. When Detective Haggis interviewed Alvarez again on July 1, 2019, Alvarez was even more emotional than when interviewed in February. Although Alvarez previously associated with West Side Reseda members, Alvarez stopped associating with them after Soto was killed.

Ibarra was a Reseda 13 member. He had a tattoo on his hand that said, "RIP Mousie." Cendejas was also a Reseda gang member. He had "R13," which stands for Reseda 13, tattooed on his right arm and "Reseda" tattooed on his jaw.

Sometime after the July 2019 Baird Avenue shooting involving Ibarra and Cendejas, an officer saw Alvarez with Lopez, who had "West Valley" tattooed on his collarbone and "CYS" tattooed on his abdomen. Later, on January 30, 2020, Officer Daniel Hughes arrested Alvarez, who was with Rubalcaba. Both had spray paint on their hands, and spray paint cans were in their car. The officer found "CYS" freshly spray painted on a fence and the sidewalk. A Cowboy's beanie and a Chicago Cubs baseball cap, which were items associated with the West Valley Crazys, were recovered from the car.

Officer Bakewell testified as a gang expert. He monitored the West Valley Crazys. Officer Bakewell testified about the West Valley Crazys' rivalries, particularly with West Side Reseda and South Side Reseda. He testified about the kind of retaliation that occurs for disrespecting a rival gang, explaining that "[t]ypically it's acts of violence." He opined that the Soto and Espinoza homicides were specific acts of violence as a result of

8

the rivalry between the West Valley Crazys and West Side Reseda.

Officer Bakewell also testified that West Valley Crazys members typically gain status within their gang by committing acts of violence. They commit crimes in groups for two reasons: "One is strength in numbers. If you have more than one person, you're more inclined to commit acts of violence. Another reason is, is to have witnesses. Especially if you're a newer member in the gang. You're going to want more senior or more established gang members to observe you doing those acts of violence so that way you can gain credibility within that gang."

## III. *The Jury's Verdict*

After the People rested, Alvarez and Ayala chose not to testify. They did not call any witnesses.

The jury convicted Alvarez and Ayala of the attempted murder of Ibarra and Cendejas and found true the allegations the attempted murders were committed willfully, deliberately, and with premeditation. It also convicted them of assault with a firearm on Ibarra and Cendejas. As to all counts against Ayala, the jury found true the special allegation that a principal had been armed with a firearm (§ 12022, subd. (a)(1)). However, the trial court struck that allegation. It had been erroneously omitted from the verdict forms for the counts against Alvarez.[2]

---

[2] The prosecutor's theory of the case was that Alvarez was the shooter and that Ayala was the aider and abettor. The trial court struck the section 12022, subdivision (a)(1), allegation because there was "no allegation that Mr. Ayala used a weapon or provided it," while "the person [Alvarez] that under the prosecution's theory was the actual shooter is facing a sentence that doesn't have any firearms allegations at all."

The jury found not true that Alvarez personally used a firearm, personally inflicted great bodily injury upon Ibarra, or personally and intentionally discharged a firearm causing great bodily injury to Ibarra.

## DISCUSSION

Alvarez and Ayala contend their convictions should be reversed because the trial court abused its discretion in admitting gang evidence. They also assert their convictions for attempted murder and assault with a firearm as to Cendejas (counts 2 and 4) were not supported by substantial evidence. They further contend the trial court committed prejudicial error by failing on its own motion to modify CALCRIM No. 875 to make clear that, when there are multiple victims, the application of force element applies to each victim. We reject those contentions.

I.    *The Trial Court Did Not Abuse Its Discretion in Admitting Gang Evidence*

A.    *Additional background*

The prior informations alleged the crimes had been committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) The People moved to introduce, and Alvarez filed a motion to exclude or limit, gang evidence. Ayala joined in Alvarez's motion.

At the hearing on the motions, the People moved to strike the section 186.22 gang enhancement allegation in part because of "the change in requirements for a pattern of criminal activity," but still sought to introduce gang evidence as relevant. The trial court granted the People's motion to strike.

The court also found that gang evidence was relevant for motive and intent. Evidence about the intensity of gang rivalry, not merely its existence, would help the jury. Drawing a

10

distinction between recent shootings as opposed to those from the distant past, it observed that the People sought to introduce evidence of "shootings between these two gangs within months of the shooting at issue in this case." The court also found relevant the intensity of Alvarez's and Ayala's involvement within the gang, drawing a distinction between active members and peripheral members. It stated, "Attempted murder requires an intent to kill. So if there had been a murder or attempted murder of a member of the gang to which the defendants allegedly belong, . . . the theory that this shooting was payback for another . . . would tend to show that there was an intent to kill, not just an intent to hurt somebody." It further explained Alvarez and Ayala's status as active members of the same gang would tend to show that one intended to aid and abet the other. The court found the prejudicial effect of the gang evidence did not substantially outweigh its probative value, which, "in this case, is particularly high."

The prosecutor in her closing argument stated, "Rivalry and revenge were the motivation in this case." She argued that the shooting in this case and the shooting of Espinoza were "payback" for the Soto killing. She also argued that, before Soto's death, Alvarez "kind of straddled the line between the two rival gangs." But after Soto's shooting, Alvarez was seen multiple times with West Valley Crazy members and was even tagging with West Valley Crazy graffiti. Soto's murder thus was the turning point that motivated Alvarez to become a "full-fledged West Valley Crazy gang member" and required him to "put in work to prove himself to his gang and his fellow gang members, including Ayala." That work included carrying out the crimes in allegiance to his gang.

11

**B.**    *Applicable law and standard of review*

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) "Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095 (*Ramirez*).)

"A court's admissibility ruling is reviewed for abuse of discretion." (*Ramirez*, *supra*, 13 Cal.5th at p. 1095; accord, *People v. Ng* (2022) 13 Cal.5th 448, 540.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712; accord, *People v. Thai* (2023) 90 Cal.App.5th 427, 433 [quoting *Haraguchi* and stating that a trial court abuses its discretion when its decision falls "outside the bounds of reasons, i.e., was arbitrary, capricious, or patently absurd"]); see *People v. Armstrong* (2019) 6 Cal.5th 735, 756 [abuse of discretion may include applying an erroneous legal standard].)

**C.** ***The trial court did not err or otherwise abuse its discretion and, in any event, there was no prejudice***

Alvarez and Ayala argue the trial court erred by admitting gang evidence without considering Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which, effective January 1, 2022, added Penal Code section 1109, among other changes. (Stats. 2021, ch. 699, § 5.)  Section 1109 provides "that, if requested by the defense, a trial court must try a [section 186.22] gang enhancement charge separately from the underlying offense."  (*People v. Burgos* 16 Cal.5th 1, 7; *People v. Tran* (2022) 13 Cal.5th 1169, 1206 [section 1109 "requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime"].)  To the extent Alvarez and Ayala argue that Assembly Bill 333 places additional limits on the introduction of gang evidence, beyond those already contemplated by Evidence Code section 352, where no violations of Penal Code section 186.22 are alleged, we reject their argument.

Here, the trial court struck the section 186.22 gang enhancement allegation.  Nevertheless, as the Supreme Court has held, "gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime." (*People v. Tran*, *supra*, 13 Cal.5th at p. 1208; see *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132, disapproved on other grounds as stated in *People v. Burgos*, *supra*, 16 Cal.5th at p. 31 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].) Gang evidence may thus be admissible in the absence of any gang

enhancement allegation. (See *Ramirez, supra,* 13 Cal.5th at p. 1095.)

Alvarez and Ayala next argue the gang evidence was more prejudicial than probative. But, as the trial court found, evidence of gang membership, rivalry between their and the victims' gangs, the intensity of the rivalry, their level of involvement in their gang, and other gang-related evidence was highly relevant to prove their motives for the shooting. (See, e.g., *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 ["[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related"; " ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence" ' "].) Indeed, in *People v. Martinez* (2003) 113 Cal.App.4th 400, the Court of Appeal determined that the jury could reasonably infer from gang evidence that the motive for the shooting involved gang rivalry. The Court of Appeal concluded that motive was relevant to support the jury's attempted premeditated murder findings. The gang evidence in *Martinez* included the attempted murder victim's acknowledgement that he was a member of the Jeffrey Street gang, evidence that defendant was a member of the rival Compton Vario 132nd Street gang and one of defendant's former fellow gang members had been killed in an incident involving Jeffrey Street, and the gang expert's testimony about the concept of payback in gang culture as being a retaliatory act for a wrong committed by a rival gang. (*Id.* at pp. 412–413.)

Ayala argues that the bare fact of Alvarez and Soto's friendship was sufficient to establish that retribution for Soto's

14

death was a motive for the charged crimes. That fact alone, however, fails to establish why Alvarez, let alone Ayala who did not share the same closeness with Soto, would want to shoot Ibarra and Cendejas as retaliation for Soto's death. Evidence of the intense rivalry and enmity between the two gangs and Ibarra and Cendejas's membership in the rival gang that killed Soto was necessary to establish both Alvarez *and* Ayala's motive for shooting the victims. Ayala further ignores that gang evidence was relevant to assess the credibility of the victims' claims at trial as to their professed lack of knowledge regarding the incident, in the face of prior inconsistent evidence to the contrary. (*People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1168 [gang evidence is relevant to a witness's credibility].)[3]

Alvarez and Ayala argue that having multiple officers testify regarding their connection to the West Valley Crazys was excessive. However, as the trial court found, the intensity of Alvarez's and Ayala's involvement in the gang was relevant to motive. The testimony of several officers was required to prove different aspects of that involvement.[4] For example, Detective

---

[3] In its motion to introduce gang evidence, the People had argued such evidence was relevant to explain "why victims of a gang shooting may not tell the truth or admit to observations made." The jury was instructed it could consider gang evidence for, among other limited, specified purposes, "the credibility or believability of a witness."

[4] Although Alvarez and Ayala assert that four officers testified about Ayala's moniker, their record citations only show that Officer Manuel Vargas testified that Ayala's moniker was "Quieto" and Detective Bryce Kirk testified it was "Silent." The testimony of each provided information not supplied by the other.

15

Bryce Kirk's testimony established Ayala's membership in the West Valley Crazys stretched back to approximately 2008. Detective Haggis's testimony showed Alvarez's closeness to Soto, whose death served as the catalyst for Alvarez's greater commitment to the West Valley Crazys. Another officer's testimony established Alvarez and Ayala attended Soto's funeral. The trial court's determination that the prejudicial effect of the gang evidence did not substantially outweigh its probative value was neither arbitrary nor capricious, nor was it patently absurd. To the contrary, the trial court's conclusion was well within the bounds of reason. (See *People v. Thai, supra,* 90 Cal.App.5th at p. 433.)

Alvarez and Ayala contend that the trial court's "wholesale admission" of gang evidence resulted in a "fundamentally unfair" trial and denied them due process of law. We disagree. The evidence, while extensive, was relevant to showing why Alvarez and Ayala would shoot at those particular victims in that particular area. Per the People's theory, the shooting occurred in the context of a gang rivalry. The admission of gang evidence was not unfettered. The court carefully considered and limited the admission of certain types of gang evidence. For example, in discussing the admissibility of Officer Bakewell's expert testimony, the court stated, "[C]ertain stuff about gang members in general is of somewhat limited relevance. [¶] [I]t's relevant if it's specific. Let's not talk about gang members generally. Let's talk about: Does this gang have this sign? Does this gang use this graffiti?" It instructed the prosecutor to "get as specific as

---

Alvarez and Ayala also do not demonstrate that the remaining two witnesses testified regarding Ayala's moniker.

16

we can to these two gangs" when examining Bakewell. We reject Alvarez and Ayala's contention that they were deprived of a fair trial and due process of law.

Finally, Alvarez and Ayala contend the trial court abused its discretion in allowing Officer Hughes to testify about the Mexican Mafia. They assert that the evidence regarding the Mexican Mafia has little bearing on the issues and was inflammatory. During trial, Officer Hughes was shown photos of the gang graffiti that he had observed when Alvarez was arrested in January 2020. When the officer testified that photo A showed "the letter[s] 'CYS' and 'X3,' which stands for 13," the prosecutor asked what the significance of 13 was to the gang. Officer Hughes replied, "It's—they are associated with the Mexican Mafia." There was no defense objection to that first reference to the Mexican Mafia or request that the testimony be stricken. It was not until the prosecutor asked, "What are we looking at in photo B," that Alvarez's counsel stated, "Objection. 352." After the court overruled the Evidence Code section 352 objection, Officer Hughes responded, "That's the letter 'CYS' with a kanpol." Asked what that was, Hughes replied, "It's . . . called a kanpol. It's the three dots with the two lines. It's a Mayan symbol representing—again associated with the Mexican Mafia." There was no further objection or request to specifically strike any reference to the Mexican Mafia.

As the People point out, however, Alvarez and Ayala forfeited the issue by failing to timely and specifically object to Officer Hughes's testimony about the Mexican Mafia in the trial court. (See *People v. Jackson* (2016) 1 Cal.5th 269, 366 [" 'the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not

17

cognizable' "; " '[a] general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal' "]; see also Evid. Code, § 353.)  Although Alvarez and Ayala contend they specifically objected to Officer Hughes's testimony regarding the Mexican Mafia, the record shows defense counsel merely objected to the question asking, "What are we looking at in photo B."  He did not object to the questions that elicited Officer Hughes's testimony referring to the Mexican Mafia, nor did he move to exclude or strike that testimony.

In any event, it is not reasonably probable that Alvarez and Ayala would have obtained a more favorable outcome in the absence of Officer Hughes's two brief references to the Mexican Mafia.  (See *People v. Trujeque* (2015) 61 Cal.4th 227, 280 [Evidence Code section 352 claim is reviewed under reasonable probability standard for prejudice]; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1103 [same].)  The jury was not presented with any further evidence regarding the brief reference to, let alone any separate violence associated with, the Mexican Mafia.[5]  The

---

[5]     The cases cited by Alvarez—*People v. Albarran* (2007) 149 Cal.App.4th 214 and *People v. Ayala* (2000) 23 Cal.4th 225— are thus distinguishable.

In *Albarran*, the prosecution presented "a panoply" of "extremely inflammatory" "gang evidence, which might have been tangentially relevant to the gang allegations, but had no bearing on the underlying charges," including "graffiti . . . attributed to Albarran's gang which contained a specific threat to murder police officers. . . ." (*People v. Albarran*, *supra,* 149 Cal.App.4th at pp. 220, 227.)  Moreover, during opening statements, "[t]he prosecutor . . . showed a picture of Albarran's gang tattoos,

18

jury was also instructed that it "may not conclude from [the gang evidence] that the defendant is a person of bad character or that he has a disposition to commit crime," and we presume it followed the instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are presumed to understand and correlate instructions and to have followed court's instructions].) Moreover, although Hughes's testimony indicated that Alvarez had painted the graffiti referring to the Mexican Mafia, the jury nevertheless found not true the firearm allegations against Alvarez, which would seem to indicate the jury's passions were not inflamed by the Mexican Mafia references. (See, e.g., *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1368 [jury's finding the

describing one of the tattoos as a 'reference to the Mexican Mafia, which is a violent prison street gang that controls the Hispanic street gangs.' The prosecutor noted that when a person has such a tattoo it shows allegiance to the Mexican Mafia." (*Id*. at p. 220.)

In *Ayala*, the court held that defense counsel was not ineffective in electing not to present testimony from a potential defense witness. The prosecutor had threatened to challenge the veracity of the witness with claims that the witness had lied about being "in trouble with the Mexican Mafia" in order to secure a transfer to another prison. Given defense counsel's concerns that such testimony would inject the subject of "prison gangs" into a case where no other gang-related evidence was admitted, and might "cause the jury to believe that [defendant] belonged to the gang" the court reasoned "we cannot say that counsel['s] [decision] was unreasonable . . . ." (*People v. Ayala, supra*, 23 Cal.4th at pp. 272, 274–275.)

19

deadly weapon use enhancement not true indicates it was not prejudicially influenced by evidence related to machete]; *People v. Williams* (2009) 170 Cal.App.4th 587, 612–613 [finding "no reasonable likelihood the 'jury's passions were inflamed' " by evidence of uncharged offenses where the jury acquitted the defendant of one charge and found not true an enhancement allegation].)

II.     ***Substantial Evidence Supported the Convictions on the Counts with Cendejas as the Victim***

Alvarez, with Ayala joining, contends substantial evidence did not support the convictions for attempted murder and assault with a firearm as to the counts with Cendejas (as opposed to Ibarra) as the victim.  Specifically, Alvarez and Ayala assert that "there was virtually no evidence to support a reasonable conclusion that the shooter had fired any bullets in such proximity to Cendejas that he was put in reasonable jeopardy of being struck by any of the fired bullets."

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)  "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Ibid.*)  Although the lack of a motive for the shooting is not dispositive, "where motive is shown, such evidence will usually be probative of proof of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 742.)  Moreover, " '[t]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with

20

express malice.' " (*People v. Foster* (2021) 61 Cal.App.5th 430, 440; accord, *Smith*, at pp. 741–742 [purposefully firing a lethal weapon at another at close range gives rise to an inference of an intent to kill that is not dependent on any further showing of motive to kill the victim].)

Further, the crime of assault with a firearm requires proof the "defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person." (CALCRIM No. 875; see *People v. Delacerda* (2015) 236 Cal.App.4th 282, 291; *People v. Velasquez* (2012) 211 Cal.App.4th 1170, 1176 (*Velasquez*).)

Alvarez and Ayala contend there was insufficient evidence to establish (1) the specific intent to kill Cendejas and the commission of a direct but ineffectual act toward accomplishing the intended killing; and (2) an act with a firearm that by its nature would directly and probably result in the application of force to Cendejas. Pointing out that the jury found not true the personal-use-of-a-gun allegations against Alvarez, he and Ayala assert that the jury found them both guilty on aider and abettor theories. They contend, because there was insufficient evidence of Cendejas's proximity to the line of fire, the shooter is not liable for attempted murder and assault with a firearm. Accordingly, they argue, the aider and abettor cannot be liable for those crimes.[6] (See *People v. Silva* (2023) 87 Cal.App.5th 632, 639–640

---

[6] Since, as discussed below, we reject their argument regarding the lack of proximity of Cendejas to the line of fire, it is not material to the disposition of this opinion who the jury identified as the actual shooter.

[" '[a]iding and abetting is not a separate offense but a form of derivative liability for the underlying crime' "].)

In response, the People assert there was substantial evidence to show the shooter fired at Ibarra *and* Cendejas. The People point out the surveillance video and Bueno's testimony establish that Ibarra, who had been shot, and Cendejas were walking together on the sidewalk on Baird Avenue before the shooting, as Alvarez and Ayala acknowledge on appeal. Bueno testified that the shooter "opened fire on the two guys in front," and there was evidence of five gun shots. Cendejas testified at the January 2020 preliminary hearing that he "got shot at."

Alvarez and Ayala, however, urge this court not to consider that preliminary hearing testimony on the ground an attorney's questions are not evidence. At trial, the prosecutor, referring to Cendejas's January 2020 preliminary hearing testimony, asked: "Mr. Cendejas, did you testify as follows: 'Question: In your words, what happened on Baird Avenue? Answer: Um, you know what happened. I got shot at.' Was that your testimony that day?" Cendejas, in response, testified, "No. I don't remember."

We do not need to determine whether Cendejas's preliminary hearing testimony was properly admitted as a prior inconsistent statement (see, e.g., Evid. Code, §§ 770, 1235) because other evidence established that Cendejas had been "shot at." Cendejas's statement during his August 2019 interview that he and Ibarra "just started . . . gettin' shot at" shows Cendejas's proximity to the line of fire. The video and transcript containing that August 2019 statement were admitted in evidence without objection by defense counsel. Moreover, Bueno testified that the shooter fired at Cendejas and Ibarra from a distance of about 35

22

to 45 feet.  Point blank range is not required for an inference of intent to kill to arise.  (See *People v. Perez* (2010) 50 Cal.4th 222, 230 [firing a bullet into a group from a distance of 60 feet may be sufficient to establish intent to kill someone in the group]; *People v. Foster*, *supra*, 61 Cal.App.5th at p. 440 [affirming convictions on multiple counts of attempted murder where, among other factors, shooter fired weapon at a distance of 40 to 50 feet at a group of six people standing close to one another].)  There was thus substantial evidence that Cendejas was in close enough range to the shooter and in the line of fire to support the findings that the shooter specifically intended to kill Cendejas and committed a direct but ineffectual act toward accomplishing the intended killing.[7]  There was also substantial evidence of such

---

[7]    In closing argument, the People argued the shooter intended to kill *both* Ibarra and Cendejas.  The People did not argue that Ibarra had been the shooter's primary target, nor was the jury instructed on a "kill zone" theory of liability.  (See *People v. Mumin* (2023) 15 Cal.5th 176, 209 [existence of a primary target is important to liability under a kill zone theory because it helps define the extent of the kill zone]; *People v. Canizales*, *supra*, 7 Cal.5th at pp. 602–603 [under the kill zone theory of liability, " ' "[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone" ' "].)  The parties on appeal do not argue the kill zone theory applies to this case.

Rather, Alvarez and Ayala contend there was insufficient evidence that the shooter targeted Cendejas because there was no evidence of Cendejas's proximity to the line of fire.  We thus focus only on the proximity evidence, given the nature of Alvarez and

23

proximity to establish the perpetrator committed an act with a firearm that by its nature would directly and probably result in the application of force to Cendejas. (See, e.g., *People v. Williams* (2001) 26 Cal.4th 779, 790 [Court of Appeal should not have reversed conviction for assault with a firearm where circumstances included defendant firing a warning shot at King's truck knowing that King was "in the near vicinity"].)

III. *The Trial Court Did Not Commit Prejudicial Error in Failing To Modify CALCRIM No. 875*

The trial court instructed the jury with CALCRIM No. 875. That instruction provided as follows: "To prove that the defendant is guilty of [the crime of assault with a firearm], the People must prove that: [¶] 1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the

_____

Ayala's argument. Nevertheless, we observe that there was evidence of motive and other factors probative of specific intent to kill Cendejas, including the evidence that Cendejas belonged to a rival gang. Such additional evidence augments the other evidence of Cendejas's proximity to the line of fire supporting the convictions for the attempted murder of Cendejas. This same evidence also supported Alvarez's and Ayala's specific intent to kill *Ibarra*, the sufficiency of which they do not challenge on appeal, the only additional evidence being that a bullet actually struck Ibarra.

24

defendant acted, he had the present ability to apply force with a firearm to a person."

Alvarez, again joined by Ayala, contends the trial court prejudicially erred by failing sua sponte to modify CALCRIM No. 875. Although acknowledging the instruction is a correct statement of the law when there is a single victim, Alvarez and Ayala assert that, when there are multiple counts, each with a different victim, the instruction's references to "a person" or "someone" may mislead the jurors to conclude that the application of force to any one victim satisfies the element for the assault counts involving the other victims.

In support of their argument, Alvarez and Ayala cite *Velasquez, supra*, 211 Cal.App.4th 1170. In that case, the defendant fired a gun at a residence occupied at the time by five people: four in the house and one (Maria) in the garage. (*Id*. at pp. 1171–1173.) The prosecution's theory was that the defendant shot at the garage 10 times. Defendant was charged with and convicted of five counts of assault with a firearm, one for each resident. (*Id*. at p. 1175.) The Court of Appeal reversed the convictions for the four counts in which Maria was not the victim. The trial court had instructed the jury with CALCRIM No. 875, but because the instruction referred to application of force "to a person" or "to someone," the jury may have found the defendant guilty of assaulting the other four residents based only on a finding of a direct and probable application of force to Maria. (*Velasquez,* at pp. 1176–1177.)

In response, the People contend Alvarez and Ayala forfeited their argument by failing to raise it in the trial court. As the People point out, " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too

general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 671.) However, a failure to object "does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights." (*People v. Thomas* (2023) 14 Cal.5th 327, 382; see § 1259.) "Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Alvarez and Ayala's claim of instructional error pertains to the elements of the crime of assault with a firearm and thus affects their substantial rights. It has not been forfeited. (See, e.g., *Velasquez*, *supra*, 211 Cal.App.4th at p. 1177, fn. 5 [challenge to CALCRIM No. 875 on the ground it refers ambiguously to application of force "to a person" or "to someone" was not forfeited because it "affected Velasquez's substantial rights"].)

Nevertheless, we observe that, in *Velasquez*, *supra*, 211 Cal.App.4th 1170, there was evidence that the shooter focused on a specific part of the house where only Maria was located. There was no similar evidence here, where the victims were standing in close proximity to each other.

In any event, any error by the trial court in not modifying CALCRIM No. 875 was harmless beyond a reasonable doubt. (See *Velasquez*, *supra*, 211 Cal.App.4th at p. 1177 ["[b]ecause the error violated Velasquez's constitutional rights, we must review the record to determine whether the error was harmless beyond a reasonable doubt"].) In addition to CALCRIM No. 875, the jury was instructed, "Each of the counts charged in this case is a separate crime. You must consider each count separately and

26

return a separate verdict for each one." We presume the jury followed that instruction and considered count 4, the assault count involving Cendejas, separately from count 3, the one involving Ibarra, and vice versa. (See *People v. Sanchez, supra*, 26 Cal.4th at p. 852; see also *People v. Thomas, supra*, 14 Cal.5th at p. 382 ["[d]efendant's claim requires an evaluation of ' " 'the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction' " ' "].) Moreover, in its count 4 verdict forms, the jury stated it found Alvarez and Ayala "did will fully [*sic*] and unlawfully commit an assault on Jasper Cendejas with a firearm," with Cendejas's name in all capital letters. Similarly, in its count 3 verdict forms, the jury stated it found Alvarez and Ayala "did willfully and unlawfully commit an assault on Alex Ibarra with a firearm," with Ibarra's name in all capital letters. This also shows the jury based its verdicts for each of counts 3 and 4 on an application of force to the proper victim. (See *In re Martinez* (2017) 3 Cal.5th 1216, 1226–1227 [instructional error may be harmless when " 'other aspects of the verdict or the evidence leave no reasonable doubt' " that the jury made the necessary findings].)

Alvarez and Ayala contend the trial court's error was not harmless because there was no evidence of Cendejas's proximity to the line of fire and thus the jury necessarily relied on an assault on Ibarra to convict on the assault count with Cendejas as the victim. For the reasons we have already discussed, we reject that contention.

27

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

BERSHON, J.\*

We concur:

EGERTON, Acting P. J.

ADAMS, J.

---

\*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28